**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HEADS AND THREADS COMPANY, A DIVISION OF MSL INDUSTRIES, INC., Respondent.**

**No. 1311, Docket 82–4217.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1983.

Decided Dec. 9, 1983.

William M. Bernstein, N.L.R.B., Washington, D.C. (W. Christian Schumann, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Herbert Burstein, New York City (Zelby & Burstein, Randy L. Levine, New York City, of counsel), for respondent.

Before FRIENDLY, KEARSE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The National Labor Relations Board ("Board") found that respondent Heads and Threads Company, a Division of MSL Industries, Inc. ("Heads and Threads" or "Company") violated Sections 8(a)(1), (3) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1), (3) and (5). It seeks enforcement of the usual cease and desist order, an order directing reinstatement of striking employees, with back pay, and an order directing Heads and Threads to bargain with Local No. 210, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 210"). With the exceptions noted below, we grant enforcement.

## BACKGROUND

At the time of the incidents in question, Heads and Threads employed twelve workers at its warehouse in Woodside, Queens. Talk of unionization at the facility occurred in May, 1980, when a warehouse worker, Lamar Johnson, discussed it with fellow workers. In June, Local 210's representative Al Bedell gave Johnson representation cards which Johnson in turn gave to his co-workers. Seven workers signed cards.

In mid-June, two union supporters at the warehouse approached a third employee, Willie Ravenell, and asked him why he had never before attempted to organize. Ravenell explained that past organizers had been dismissed. Shortly thereafter, the two union supporters who had approached Ravenell were dismissed. A Heads and Threads supervisor, Roosevelt Richardson, said to Ravenell, "You see what happens with union guys ...." Further discussion of unionization among the employees occurred, however, and, in August, Richardson said to Ravenell, "Hey man, you're trying to get a union in here. You know what happened when you all tried to get a union in here before, what happened to them guys." Ravenell cursed at Richardson in response.

On September 9, eight employees met at the warehouse with Local 210's business agent, James Martinez, and told him they were being harassed because of their unionization efforts. Martinez once again had them sign representation cards and explained that this would allow him to go to their employer and to petition the Board for an election. On September 10, Martinez returned to the warehouse with another Local 210 representative, Julius Zaretsky. Together they spoke to the Company's manager, Gregory Svida, telling him that Local 210 represented a majority of the Company's Woodside employees and wanted to negotiate a contract. Svida replied that he had no authority to negotiate with the union and had to contact his superiors. Svida agreed to call the union representatives by September 15.

Meanwhile, a series of confrontations occurred between Richardson and various em-

ployees. On September 11, Richardson told one Willie Gross that he was not working fast enough, and, when Gross offered an explanation, Richardson called him a liar. Gross, in turn, swore at the supervisor, and Richardson responded by "punching out" Gross' time card and firing him. In doing so, Richardson told Gross that he was "not going to get the union." On the same day, Richardson told Ravenell that he, Ravenell, would have to "pull orders" as well as put up stock if he wished to retain his job. Ravenell had never before been required to do this additional work. Richardson warned him, "The union can't help you now because you ain't in the union. I'll fire you right now and send you home."

As a consequence of the Gross incident, the employees walked out in protest. Local 210, however, contacted Svida who had Gross reinstated. The other employees returned to work without loss of pay. The walkout had lasted two hours.

The next day, September 12, Richardson walked around the warehouse holding a crowbar and saying, "Damn Bill [Gross], if I get my hands on him I'm going to kill him." After work, Richardson was drinking with Ravenell and told him that he "shouldn't be with the union" because he was going to be promoted to assistant foreman, would soon receive the keys to the warehouse with the responsibility of closing the facility and would receive a raise. Ravenell did not take all the promises seriously.

On Monday, September 15, the day on which Svida was to meet with Local 210 representatives, Ravenell punched into work at 7:45 a.m., fifteen minutes before his usual starting time. When Richardson said he must begin work upon punching in, Ravenell protested and refused, since he would not be paid for time worked prior to 8:00 a.m., and since he had never before been made to start work when he punched in early. Later that day, Richardson again confronted Ravenell and told him his coffee break could last only five minutes, as opposed to the usual ten. Richardson also told Lamar Johnson "to speed up" work or be discharged and Horace Ross that he was henceforth to advise Richardson every time he, Ross, went to the men's room.

During that same day, Zaretsky and Martinez advised the employees that Heads and Threads was not going to recognize Local 210 as their bargaining representative. At that time, eight of the twelve employees had signed authorization cards. The employees said they were contemplating striking, and Martinez and Zaretsky advised them that it was their decision. Meanwhile, Ravenell was called to Svida's office where Svida told him "You got a whole lot to lose messing around with the union cause you've got a lot of time in, your seniority, your profit sharing, plus your hospitalization." This did not deter Ravenell, because he felt harassed by Richardson, and shortly thereafter he and ten other unit employees went out on strike.

On September 16, on the first full day of the walkout, a worried Ravenell returned to the warehouse to talk about his vacation pay and profit sharing with Alvin Zee, Heads and Threads' Vice President. Zee told Ravenell that "the union idea is going to get you in a lot of trouble." Zee also told him that the company wanted to use him in their new Florida warehouse, a move Ravenell desired. Ravenell said he would return to work but only if the company executed a written promise not to discharge him. Nothing came of this discussion, however.

Also on September 16, Heads and Threads sent a letter to the striking employees. The letter stated, *inter alia,* that "It is our sincere hope that all employees will return to work and re-establish normal operations. The decision to return to work is up to you and you will not be discharged or disciplined for not returning to work. However ... the Company reserves its option to exercise its legal right to permanently replace you in order to continue business." This was followed by a second letter on September 18, which stated, *inter alia,* "We still look forward to your return because a strike is a devestating [sic] experience for everyone involved.... We urge you to return to work by noon on Monday,

September 22nd. We will begin the process of hiring new employees to permanently fill your job. This will leave you with only the right of being placed on a preferential hiring list. Please remember you will be replaced and not discharged."

With the exception of one employee, Joseph Russo, none of the striking employees responded to these overtures. Russo, however, called Svida on September 21 and offered to return to work, but expressed fear of strikers on the picket line. Svida agreed to reinstate Russo and arranged to have security personnel escort him to and from the warehouse in a van. However, when the security vehicle arrived at Russo's home on September 22, Russo would not leave. Russo later explained to Svida that he would not come to the warehouse as he did not wish to do so surreptitiously or in the company of a guard. What was said at the end of the conversation was disputed. Svida maintained that Russo told him that he had accepted another job. Russo, on the other hand, testified that he told Svida only that if he could find employment elsewhere he would not return to the warehouse. Svida's version was confirmed in a letter to Russo on October 2, to which Russo did not reply.[1] The ALJ, however, rejected Svida's version and the Board adopted this finding. The ALJ was persuaded by the fact that Russo never testified he had accepted another job in the interim—in fact Russo did not accept another job until December 1 (after the company rejected the union's unconditional offer to return to work). In addition, both Svida and Russo testified that the latter rejoined the picket line after September 22, which the ALJ found partially explained Russo's not responding to the October 2 letter. Yet the record shows that Svida received a phone inquiry from an insurance company checking an employment reference for Russo. It is thus apparent that Russo was certainly looking for another job.

On November 10, Local 210's secretary-treasurer sent a telegram to Heads and Threads. The telegram stated:

On behalf of each and every striking employee, we hereby make an unconditional offer on their behalf to return to work immediately. Please contact the undersigned or the individuals directly to arrange for their return to work immediately.

The company declined to reinstate the employees in a timely fashion. Local 210 filed charges with the Board alleging violations of Sections 8(a)(1), (3) [2] and (5) [3] of the Act, 29 U.S.C. §§ 158(a)(1), (3), (5), for threatening the discharge of employees who were on strike, for refusing to reinstate the employees who remained on strike and for refusing to bargain with the union. The cases were consolidated and heard by Administrative Law Judge ("ALJ") Steven Davis.

On November 30, 1981, the ALJ issued his decision holding that Heads and Threads had violated Sections 8(a)(1), (3) and (5) of the Act. He found that the September 15

---

1. The letter from Svida to Russo was as follows:

October 2, 1980

Mr. Joseph Russo
67–15 52nd Avenue
Maspeth, New York 11378
Dear Joe:

This is to confirm our telephone conversation of September 22, 1980 that you have accepted employment elsewhere and will not be returning to Heads and Threads Company. You were a valuable employee and we are sorry to hear of your decision. We do, however, wish you the best of luck in the future.

Very truly yours,
HEADS AND THREADS COMPANY
/s/
Gregory J. Svida
Branch Manager

2. 29 U.S.C. §§ 158(a)(1) and (3) state that:

(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in . . . this title;
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .

3. 29 U.S.C. § 158(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ."

strike was an unfair labor practice strike in protest of employer harassment of workers. He also ordered Heads and Threads to cease and desist from its unlawful practices, to reinstate and make whole the striking employees and to bargain with Local 210. The Board affirmed the ALJ with certain modifications which need not be detailed.

## DISCUSSION

### 1. *The Unfair Labor Practices*

Heads and Threads questions a number of the Board's findings, arguing that (i) Richardson's statements and threats to Gross, Ravenell, Johnson and Ross were not violations because the employees did not believe them; (ii) no promises of benefit conditioned on abandonment of the union were made to Ravenell by either Richardson or Zee; (iii) Gross was not discharged on September 11; (iv) Svida's and Zee's statements of September 15 and 16 were merely predictions protected by Section 8(c) of the Act, and (v) the Company's failure to reinstate the strikers did not violate the Act because economic strikers may be replaced. These claims are almost entirely factual and thus must be rejected if there is substantial evidence in the record to support the Board's conclusions. *NLRB v. American Geri-Care, Inc.,* 697 F.2d 56, 59–60 (2d Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983). We address them seriatim.

■ The record amply demonstrates that Richardson's June, August and September statements constituted interference in the exercise of the employees' rights to organize for purposes of collective bargaining. These pronouncements were often threatening, avowedly anti-union and coincided with the heating up of union organizational activity. Even if we were to assume that Richardson's animus toward Gross was longstanding and that neither Johnson nor Ross expected to be fired, such facts would not dictate a conclusion that no violation occurred. The record shows that changes in the work rules were imposed under threat of discharge and in the context of other coercive conduct by the Company. The

threat against Gross came one day after he was fired and at the same time he was told he was not going to get a union. The Board could thus reasonably conclude that Gross was threatened in retaliation for his union activity. Similarly, contrary to the Company's argument, Richardson's statements to Johnson and Ross were neither "off the cuff" nor "isolated." They were consistent with similar remarks made to others throughout the previous week and were made at a time when Local 210 representatives were due to visit the plant. An inference of anti-union animus and interference with the employees' organizational rights is clearly supportable.

The Company also argues that Richardson's September 12 overtures were not "promises" in violation of the Act because they occurred while Richardson and Ravenell were drinking after hours and because they were not conditioned on abandonment of the union. The Company also argues that Zee's offer to Ravenell of employment in the Florida facility was not actionable because Ravenell had approached Zee, the two were friends and Ravenell had said he needed a job. Whether these activities were violations also depends upon factual inferences. As to Richardson's offer, there is substantial evidence to support the Board's inference that it was designed to coerce abandonment of the union. He said as much when he specifically told Ravenell that the new job would make him a company man and that he, therefore, would not be in the union. That the two were drinking at the time hardly detracts from the Board's conclusion. As to Zee's offer, it came immediately after he had told Ravenell "the union idea is going to get you in a lot of trouble." The clear implication was that the trouble would end if he stopped supporting the union, and the offer of employment in Florida can be viewed as designed to facilitate Ravenell's cooperation. That Ravenell may have gone to Zee on his own and that nothing came of the offer does not negate the inference of anti-union animus.

Equally fact-sensitive is the question of Gross' September 11 discharge. The evidence is clear that Gross was instructed to leave work and in fact did so. Because he was reinstated later that day, Heads and Threads contends Gross neither believed he was nor was in fact fired. Nevertheless, his employee card had been punched, and he had been told to leave. The other employees also thought Gross had been fired, since that was the reason for their two-hour walkout. The later reinstatement came not on Richardson's initiative but only after representatives of Local 210 had talked to Svida. Finally, since the discharge was the product of anti-union animus, a point hammered home when Richardson told Gross he "was not going to get the union" as he fired him, the Board properly found Section 8(a)(1) and 8(a)(3) violations.

■ Heads and Threads contends that Svida's and Zee's statements in mid-September were merely protected predictions and not unfair labor practices under Section 8(a)(1). The facts, however, support the Board's conclusion. The statements themselves were not "carefully phrased" reports conveying the "employer's belief as to demonstrably probable consequences beyond his control." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). Rather, they were phrased as threats, such as warning Ravenell that he had a "lot to lose messing around with the union" and that the union would get him in trouble. The former statement was made in the context of Ravenell's specific inquiries about benefits and the latter in the context of a job offer which would have demanded relocation. A prediction or expression is protected under Section 8(c) only if it "contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). That this necessary condition was not satisfied is virtually self-evident.

The Company also claims that the Board erred in concluding that work rule changes were in violation of Sections 8(a)(1) and (3) and that the failure to reinstate employee Russo violated Section 8(a)(3). We reject the first claim but accept the second.

Heads and Threads claims that work rule changes never occurred and, alternatively, that an anti-union motive was not demonstrated. Again, however, both claims raise factual questions for which the Board's conclusions have record support. Richardson uttered instructions which were understood as work rule changes. The context and timing of the changes permit an inference of both antiunion bias and coercion in an attempt to chill the exercise of organizational rights.

■ However, the failure to reinstate Russo did not violate the Act. In September, Russo asked for reinstatement with a guarantee of protection. The company accepted the offer and was willing to provide the guarantee as best it could. Russo then accepted reinstatement on those conditions. His subsequent stated decision to withdraw from the reinstatement agreement in order to pursue other employment and subsequent failure to respond to the October 2 letter absolved the Company of any obligation toward him. Having made the offer, outlined his concerns, accepted and then rejected the company's response ostensibly to find another job, Russo cannot now complain of the Company's later unwillingness to reassume an obligation which he himself had extinguished.

■ The Company contends that the September 15 walkout was solely a strike for recognition and, therefore, the strikers could be replaced. However, the strike occurred in the context of a pattern of illegal employer harassment and after a previous walkout protesting that harassment. In light of this, the Board might reasonably conclude that the strike was at least partly motivated by the unfair labor practices and a protected activity. *See Cagle's, Inc. v. NLRB,* 588 F.2d 943, 950 (5th Cir.1979). That the strike may have stemmed from mixed motives does not deprive the employees of their right to reinstatement. *NLRB v. Sea-Land Service, Inc.,* 356 F.2d 955, 965–66 (1st Cir.), *cert. denied,* 385 U.S. 900, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966); *NLRB v.*

*Fitzgerald Mills Corp.,* 313 F.2d 260, 269 (2d Cir.), *cert. denied* 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963). The Company's failure to reinstate the strikers upon the November 10 unconditional request for reinstatement thus violated Section 8(a)(3). *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

## 2. *The Bargaining Order*

The remaining issue of significance is the propriety of the Board's bargaining order. In cases in which a cease and desist order and an election will not deter unlawful employer conduct, a bargaining order may issue "to re-establish the conditions as they existed before the employer's unlawful campaign." *NLRB v. Gissel Packing Co.,* 395 U.S. at 612, 89 S.Ct. at 1939. In *Gissel,* the Supreme Court stated that the appropriateness of a bargaining order turns on the nature of the unfair labor practices. Where the unlawful acts are "outrageous" and "pervasive," a bargaining order can issue even in the absence of a finding that the union involved had a majority status. The Board may also issue a bargaining order "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." *Id.* at 614, 89 S.Ct. at 1940. In this intermediate case, however, the Board must make a finding that the union at one point had a majority. In the third case, where the unfair labor practices are minor and less extensive, the Board may determine that they had such a slight impact on the election process that a bargaining order is not an appropriate remedy.

The Board argues that a bargaining order is appropriate because this is an intermediate case in which the union had a card majority and the Company's unfair labor practices were serious and pervasive enough as to preclude the holding of a fair election. The ALJ and the Board emphasized that in a small unit such as this, the effect of an unlawful discharge was heightened and that the involvement of upper echelon management enhanced the coercive impact of the various unfair labor practices.

While relying on its broad discretion to determine the appropriate remedy, the Board acknowledges that the caselaw in this Circuit requires the Board to make a particularly thorough analysis of the need for a bargaining order. *See e.g. NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208 (2d Cir. 1980).

A mandatory part of the required analysis relates to events occurring after the unfair labor practices were committed but which are relevant to the question of whether a free and fair election is possible. *NLRB v. Marion Rohr Corp.,* 714 F.2d 228, 231 (2d Cir.1983). Even in the case of serious and coercive unfair labor practices, mitigating circumstances subsequent to the unlawful acts, such as employee turnover or new management, may obviate the need for a bargaining order. We have thus held that the Board may issue a bargaining order only after it has taken evidence and made appropriate findings as to the need for the bargaining order at the time it is issued, not at some earlier date. *Id.* at 231; *see NLRB v. Pace Oldsmobile,* 681 F.2d 99, 102 (2d Cir.1982) (per curiam).

In the present case the Board did not consider circumstances subsequent to the unfair labor practices in issuing the bargaining order. Instead it relied solely upon the Company's failure to offer such evidence. In view of the Board's failure to follow our decisions, we decline to enforce the bargaining order.

## CONCLUSION

We grant enforcement of the Board's order except as to the reinstatement of Russo and the bargaining order.