**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WINDSOR INDUSTRIES, INC., Respondent.**

No. 355, Docket 83–4135.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1983.

Decided March 13, 1984.

Joseph F. Frankl, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Peter Winkler, Atty., Washington, D.C.) for petitioner.

Clifford P. Chaiet, Jericho, N.Y. (Pearl & Chaiet, P.C., Jericho, N.Y.), for respondent.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This is yet another case in a long series in which the National Labor Relations Board has found that a company violated sections 8(a)(1), 8(a)(3) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (5), and then has issued a so-called *Gissel* bargaining order even though no representation election had ever been held, a considerable amount of time had elapsed between the violations and the order and there had been considerable employee turnover. The Board defends its choice of remedy primarily by arguing that a "hallmark" violation of the Act may in and of itself justify the issuance of a bargaining order under the law of this circuit and *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–40, 23

L.Ed.2d 547 (1969), which remains the Supreme Court's leading pronouncement in this area.

This case is before us on the Board's application to enforce. We enforce—though not without some doubts—as to the violations found and all remedies ordered with the exception of the order to bargain. We remand the question of the bargaining order because we think that the Board's analysis, based as it was on the fact that one of the company's violations was of "hallmark" status, fell short of the standards imposed upon the Board by the Act, by the Supreme Court, and by us.

### Facts

Windsor Industries, Inc. (the Company) is an importer and wholesale distributor of small electronic products such as radios. Its operations take place at Melville, New York, in a single facility comprised of a shipping and receiving area, a warehouse area, a repair or technicians' room, and offices. David Fink and Mickey Hiller are vice presidents in charge of operations and sales, respectively. Nick Cianflone and Pat Carrington are supervisors. On April 7, 1980, at lunchtime, Business Representative Girard Jones and Executive Vice President Gerald Hustick of the National Organization of Industrial Trade Unions (the Union) visited the Company parking lot and began speaking to employees. They spoke first to employee Joseph Benzola, who signed an authorization card, and also obtained a signed card from employee Jack Roberts, who told them he would do anything possible to help organize the shop. They also gave two cards to employee Mildred Reph, one for her and one for her son, Al, who also worked for the Company. On the 7th and 8th of April, the Union obtained, apparently with the active support of Benzola and Roberts, signed authorization cards from eight of the fifteen unit employees.

On April 10, Company vice president Hiller observed Roberts receiving a blank authorization card from one of the Union representatives. Hiller also observed Benzola, Roberts and others talking to the Union representatives during lunch and breaktimes.

Also on April 10, the Company received from the Union a telegram stating that the Union had signed a majority of Windsor employees and demanding immediate recognition. The following morning a group of employees decided to request a meeting with Company vice president Fink to tell him what benefits they wanted and what grievances they had. That afternoon twelve employees, including Benzola and Roberts, met with Company representatives. Before the meeting, the employees met to draft a list of issues to raise with management. Benzola was holding this list when the Company representatives arrived.

Fink began the meeting by reading prepared remarks from index cards. He stated that he had been advised that he could not threaten employees for union activities or promise benefits to try to sway them, nor could he ask what was wrong. He did say that he always had an open door, that he did not want "a third party to come between us" and that he did not think employees needed or should pay for "outside representation." He denied that there would be reprisals, but added that he wanted employees to know what they were "getting into."

Benzola then read the list of benefits which the employees had already prepared. Fink, as advised by counsel, responded that he could not promise anything. One employee suggested that the Friday lunchbreak be lengthened fifteen minutes so that employees could cash their paychecks. Fink answered that that sounded reasonable and that he would look into it. Benzola raised the issue of medical benefits and Fink said he would look into that. There were other suggestions regarding vacations, raises and sick days. Fink and Hiller said that they would look into these but again could not make any promises. Roberts requested that the Company post a list of holidays at the timeclock, to which Hiller responded that the request was reasonable

and that he would take care of it. When the meeting closed Benzola handed Fink the previously prepared list of grievances. Another employee who had been taking notes of the meeting handed them to Fink saying that the notes reflected what the employees wanted; Fink accepted the list and said he would look into the requests. Again Fink repeated that he could make no promises.

After the meeting, Benzola left the premises and went to speak to Union representative Hustick, who was in his car outside the Company parking lot. Company representatives apparently watched from inside the plant as the two men conversed.

On April 14, the Company, as Hiller had promised, posted a list of paid holidays next to the timeclock. The list included no additional holidays. On April 15, two working days after the grievance meeting, supervisor Cianflone told Benzola and Roberts that work was slow and that they were being laid off until further notice or until work picked up again. When asked how long the layoff would last, Cianflone said that he did not know. The Company had never previously laid off an employee, and an employee whose seniority was identical to Benzola's was not laid off. On May 29, after charges of unfair practices were filed, the Company offered Benzola reinstatement. Benzola did not respond to this offer. On June 4, the Company offered Roberts reinstatement which he accepted on June 9.

On August 3, 1981, the Administrative Law Judge found that the Company violated section 8(a)(1) of the Act by soliciting grievances from employees and promising to remedy them in order to induce them to refrain from supporting the Union. The ALJ further found that the Company violated sections 8(a)(1) and (3) by laying off Benzola and Roberts in order to discourage Union membership. The ALJ concluded that the Company had violated sections 8(a)(1) and (5) by refusing to recognize and bargain with the Union, and recommended, among other things, that the Company be ordered to bargain with the Union. In support of this recommendation the ALJ declared, citing and quoting *Gissel* and various Board cases, that there was "misconduct going to the very heart of the Act," and that the unlawful layoff of two employees in the "relatively small employee complement," together with the solicitation of employee grievances and the promising of benefits the day after receiving the Union's demand, tended to "undermine majority strength and impede the election process."

The Board majority, acting some sixteen months after the ALJ issued his decision, adopted his Rulings, Findings and Conclusions, as well as his recommended order, without adding anything in respect to the bargaining order. Chairman Van de Water and Board member Hunter did not agree that the Company's unlawful conduct was "so pervasive and likely to have a lingering impact that a fair election could not be held once [the Company] ... complied with the Board's traditional remedies," and therefore declined to join in the bargaining order.

### The Violations

We find that there was substantial evidence to support the finding that the layoffs of Benzola and Roberts were unlawful. The key question facing the ALJ was whether the Company's action was motivated by a desire to discourage Union activity, and, as we have often said, a ruling on motivation "cannot lightly be overturned." *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 464 (2d Cir. 1973), quoting *United Aircraft Corp. v. NLRB*, 440 F.2d 85, 91 (2d Cir.1971). This factual determination may, of course, be supported by circumstantial evidence. *See NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 295 (2d Cir. 1972). The test we apply is not whether we might make a different choice were the matter before us de novo, but whether there is substantial evidence on the record as a whole to support the Board's findings of fact. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464,

95 L.Ed. 456 (1951); *NLRB v. Advanced Business Forms Corp.*, 474 F.2d at 464. Here there was ample support for the Board's finding that Benzola and Roberts were laid off because of their Union activity. As we said in *NLRB v. Montgomery Ward & Co.*, 242 F.2d 497, 502 (2d Cir.), *cert. denied*, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957), "[t]he abruptness of a discharge and its timing are persuasive evidence as to motivation." Benzola and Roberts were laid off eight days after the beginning of the Union campaign, five days after the Company received the recognition demand and four days after the "grievance" meeting. In addition, as noted above, the Company had never before laid off an employee and, as we have said, an employee with seniority the same as Benzola's was not laid off. There was enough, if not an abundance of evidence to support the Board. We note also that the employer failed to overcome the Board's prima facie showing that Benzola and Roberts were laid off for their Union activities by demonstrating as an affirmative defense that it would have laid off the employees for legitimate reasons. *See NLRB v. Transportation Management Corp.*, — U.S. —, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983) (Board can shift burden of persuasion on motivation for dismissal of Union activities to employer after prima facie case of improper motivation established).

We have more of a problem with the finding of a section 8(a)(1) violation through the solicitation of grievances from employees and the promise to remedy them. The mere holding of a "gripe session" during an organizing campaign is not *per se* unlawful, and it seems to us that very little more occurred. Nonetheless even the Company does not argue that it did not make implied promises during the April 11 meeting. Rather, it argues that in a meeting on May 9 it clearly and unequivocally placed the employees on notice not only that no promises would be made, but also that no benefits would be forthcoming. The Company also stresses that it never implemented (except for the de minimis posting of a list of holidays already enjoyed by employees) any of the implied promises.

 While this court has recognized the limited impact of implied as opposed to overt promises, *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 273 (2d Cir.1981), we nevertheless cannot make de novo findings, *NLRB v. Hendel Manufacturing Co., Inc.*, 483 F.2d 350, 352–53 (2d Cir.1973), and again, must accept the Board's finding that particular conduct is violative of the Act if that finding is supported by substantial evidence. *NLRB v. American Geri-Care, Inc.*, 697 F.2d 56, 59–60 (2d Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983). Whether overt or implied, promises to employees in the midst of a Union campaign are unfair in that employees must not be lulled into believing that they can obtain benefits without the Union's aid. *See NLRB v. K & K Gourmet Meats, Inc.*, 640 F.2d 460, 466–67 (3d Cir.1981); *Landis Tool, Division of Litton Industries v. NLRB*, 460 F.2d 23, 24–25 (3d Cir.), *cert. denied*, 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972). In this case there was a combination of stated opposition to employee unionization, the commitment to "look into" employees' stated concerns, the invitation to employees to vote against the Union, and the actual remedying of one of the grievances, albeit a minute one. The case is thus distinguishable from one simply involving "no promises" disclaimers.

### The Bargaining Order

*Gissel* approved the Board's imposition of bargaining orders in two classes of cases involving employer violations. The Court first identified those cases, described in *Gissel* as "exceptional," which were "marked by 'outrageous' and 'pervasive' unfair labor practices." *Gissel*, 395 U.S. at 613–14, 89 S.Ct. at 1940 (approving in dictum *NLRB v. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir.1967)). In these cases an order to bargain might issue irrespective of whether the union had ever demonstrated majority support.

*Gissel* also recognized a second tier of "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes," and which might therefore call for the issuance by the Board of a bargaining order. 395 U.S. at 614, 89 S.Ct. at 1940. In fashioning remedies in those cases, involving "a lesser showing of employer misconduct," the Board "can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." *Id.* The Court then stated that if the Board finds "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue ...." *Id.* at 614–15, 89 S.Ct. at 1940. In a footnote the Court emphasized the Board's "fund of knowledge and expertise all its own" and said that "its choice of remedy must therefore be given special respect by reviewing courts." *Id.* at 612 n. 32, 89 S.Ct. at 1939 n. 32. With this deference to the Board's discretion in mind, we turn to a consideration of whether the Board properly issued the bargaining order in this case.

▮▮ As our discussion of the violations should suggest, we do not view Windsor's solicitation of grievances and its implied promises to remedy them as "outrageous" so as to fall within the first category of *Gissel* cases. While the unlawful layoffs violation, if not "outrageous," is certainly a "hallmark" violation as that term has come to be used in this circuit, *see NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 212–13 (2d Cir.1980), in no sense can the violation be said to be "pervasive" under *Gissel;* this was essentially one layoff, albeit of two men. This not being a "class one" case, then, our task is to determine whether the Board's order adequately explains why it believes this case falls into the second *Gissel* tier of "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." 395 U.S. at 614, 89 S.Ct. at 1940. At the outset, we reiterate what we have said repeatedly, that the Board must make "a particularly thorough analysis of the need for a bargaining order." *NLRB v. Heads and Threads Co., a Division of MSL Industries, Inc.,* 724 F.2d 282, 289 (2d Cir.1983) (citing *Jamaica Towing, Inc.*). We have also held, and now reaffirm, that events occurring after the unfair labor practices were committed are relevant to the decision to issue a bargaining order, *NLRB v. Marion Rohr Corp, Inc.,* 714 F.2d 228, 231 (2d Cir.1983), and that changed circumstances, including employee turnover or new management, may obviate the need for a bargaining order. *NLRB v. Heads and Threads Co.,* 724 F.2d at 289. *See also NLRB v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 102 (2d Cir.1982) (per curiam).[1]

Here, the Board relies principally on the facts that this was a small bargaining unit and that the layoffs were a hallmark violation. It argues that under the dictum in *Jamaica Towing,*[2] 632 F.2d at 212, the

---

**1.** Of course, these observations do not apply to cases in which the employer already is under a duty to bargain as a result of a Board-conducted election and subsequent union certification. If, after a union is certified, the employer refuses to bargain in good faith and the NLRB issues a bargaining order as a result of this refusal, the passage of time or employee turnover by no means play the same role. *NLRB v. Patent Trader, Inc.,* 426 F.2d 791 (2d Cir.1970) (en banc).

**2.** *Jamaica Towing* held that the violations there were in the category of "less serious violations which must either be numerous or be coupled with some other factor intensifying their effect before they will fall within *Gissel's* second category and support an order to bargain," 632 F.2d at 213. Therefore, when the court said that a "hallmark" violation "will support the issuance of a bargaining order unless some significant mitigating circumstance exists," *id.* at 212, or justifies "a finding without extensive explication that it is likely to have a lasting inhibitive effect on a substantial percentage of the work force,"

mere presence of a hallmark violation "support[s] the issuance of a bargaining order unless some significant mitigating circumstance exists." The Board further asserts that such a violation justifies a bargaining order "without extensive explication." *Id.* at 213.

■ Before addressing these contentions, we note that the Board in this case relied entirely on the ALJ in issuing its order. In other words, the Board itself made no independent findings, nor did it conduct its own analysis. No case in this circuit that we have found has ever faced squarely the question whether with respect to bargaining orders, it is proper for the Board to adopt the ALJ's findings and reasoning, without more. A panel in the Third Circuit had held that the Board itself must state the reasons for a bargaining order even though the ALJ has provided a statement of the considerations prompting him to recommend it. *Kenworth Trucks of Philadelphia, Inc. v. NLRB*, 580 F.2d 55, 59–60 (3d Cir.1978). However, in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), the Supreme Court stressed its concern about the danger that courts of appeals might misread or misapply "statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." In the light of *Vermont Yankee*, the Third Circuit panel on rehearing in *Kenworth Trucks* held that so long as the ALJ provided a statement of reasons for recommending a bargaining order and the NLRB specifically indicated its adoption of the findings and reasoning of the ALJ, there was no need for a separate elaboration of the factors prompting a bargaining order. 580 F.2d at 61–63. Accordingly, the court vacated its earlier decision dealing with the bargaining order. We see no reason to take a different view. We thus accept the ALJ's analysis as the Board's and turn to the question whether that anal-

ysis is sufficient, relying so heavily as it does on the *Jamaica Towing* dictum.

In this circuit we have consistently and closely reviewed NLRB justifications for bargaining orders, often remanding for the Board to explain "just what it considers to have precluded a fair election and why, and in what respects the case differs from others where it has reached an opposite conclusion." *NLRB v. General Stencils, Inc.*, 438 F.2d 894, 902 (2d Cir.1971). In *General Stencils* we compared and contrasted cases involving coercive interrogation, threats to close plants, discriminatory discharges, loss of benefits and the like, *id.* at 903, with the facts in *General Stencils*, which principally involved unlawful interrogation of one employee about his statement to a Board agent, coupled with threats to a few employees to withdraw benefits of a relatively minor nature. *Id.* at 902–03. We also noted Board cases where the Board itself declined to issue bargaining orders, *id.* at 903–04, *e.g., Schrementi Brothers, Inc.*, 179 NLRB No. 147 (1969) (employer in presence of employees threatened and physically assaulted non-employee union organizers and informed employees that the names of those visited by the organizer had been "checked out"). The case should have made clear that the analysis of the need for a bargaining order had to be, at the very least, meaningful, and we note that the Board's explanation after remand in *General Stencils* did not justify its order. *NLRB v. General Stencils, Inc.*, 472 F.2d 170 (2d Cir.1972).

It was, as noted, dictum in *Jamaica Towing*, that indicated that "highly coercive" or "hallmark" violations presumptively would support a bargaining order, "unless some significant mitigating circumstance exists." 632 F.2d at 212. Since *Jamaica Towing*, we have held, however, that even a hallmark unfair labor practice would not "automatically preclude a fair second election or mandate the issuance of a bargaining order." *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 153 (2d Cir.1981) (interrogation of three employees coupled with imple-

*id.* at 213, the language of the opinion did not go to the holding.

mentation of a wage increase). Similarly, in *NLRB v. Pace Oldsmobile, Inc.*, 681 F.2d 99 (2d Cir.1982), referring both to *J.J. Newberry* and to *Jamaica Towing*, we held that an employee discharge, an announcement as to an increase of employer contributions, threats to employees with discharge, loss of benefits or plant closure, interrogation of employees regarding union activities and a refusal to reinstate, *i.e.*, several hallmark violations, would not justify a bargaining order in the absence of a real and thorough analysis by the Board. In *NLRB v. Marion Rohr Corp., Inc.*, 714 F.2d at 231, where there had been a lapse of four years since charges were filed and two and a half years since the hearing was held, we declined even to remand an order to the Board for further consideration and simply denied enforcement, even though there had been threats of loss of benefits and less favorable working conditions, employee interrogation, discharge of one employee and threats to discharge two other employees. Once again, this was a case involving hallmark violations.

Our most recent decisions continue in this vein. In *Heads and Threads Company*, 724 F.2d at 289, enforcement of the bargaining order was denied on the strength of *Marion Rohr* and *Pace Oldsmobile*. *Heads and Threads* involved a pattern of illegal employer harassment resulting in a walkout followed by a strike. There were threats, promises of benefits, an unlawful discharge and a failure to reinstate the strikers, all of which were held to be unlawful. *Id.* at 287–288. Nevertheless, the panel declined to enforce the bargaining order. Most recently, in *NLRB v. Knogo Corp.*, 727 F.2d 55 (2d Cir.1984), this court declined to enforce a bargaining order and did not remand despite coercive interrogation of employees which created the impression that the company was engaged in surveillance of union activities, disparate enforcement of a rule as to parking, employer grants of new economic ben-

efits to employees during their union organization campaign, and a slew of other infractions. At 58. In *Knogo* we said that among the mitigating factors the NLRB is obliged to consider before issuing a bargaining order are the passage of time and the rate of employee turnover and we held that "[a]lthough 'we must guard against rewarding an employer for his own misconduct or delaying tactics,'" At 60, quoting *Jamaica Towing*, 632 F.2d at 214, where the company was not responsible for twenty-two months of the lapse of time and there was a large employee turnover, a bargaining order should not issue. *See also NLRB v. Chester Valley, Inc.*, 652 F.2d at 273.

The law of this circuit is that hallmark violations alone do not support a bargaining order, and that not only mitigating circumstances but the lapse of time, employee turnover and other significant factors must be examined.[3] The Board's responsibility in these "less extraordinary" cases is to make the determination whether or not the employer's practices have had "the tendency to undermine majority strength and impede the election processes." *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940. The ALJ's conclusory findings here are insufficient to support a bargaining order. We remand for further findings in accordance with *Gissel* and for analysis under *General Stencils, J.J. Newberry Co., Pace Oldsmobile*, and *Marion Rohr*.

Enforced in part and remanded in accordance with opinion.

---

**3.** One fact which must certainly be taken into account is whether or not a majority of the employees signed union authorization cards. *Compare United Dairy Farmers Cooperative Ass'n v. NLRB*, 633 F.2d 1054 (3d Cir.1980), *with Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C.Cir. 1983).