**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Eli GORDON, Gerald Tillinger and Seymour Tillinger, a Copartnership d/b/a Balsam Village Management Company, Respondents.**

**No. 770, Docket 85–4157.**

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1986.

Decided May 30, 1986.

Margaret Bezou, Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, N.L. R.B., John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, Michael David Fox, Attys., Washington, D.C., on brief), for petitioner.

Lawrence Solotoff, Great Neck, N.Y. (Joel Spivak, Solotoff & Spivak, Great Neck, N.Y., on brief), for respondents.

Before MESKILL, NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner National Labor Relations Board (the "Board") seeks enforcement of its order issued on December 14, 1984, finding principally that respondents Eli Gordon, Gerald Tillinger, Seymour Tillinger, and their partnership, Balsam Village Management Company (collectively the "Company"), had committed unfair labor practices in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act (the "Act"), as amended, 29 U.S.C. §§ 158(a)(1) and (3) (1982), by threatening to discharge and discharging three Company employees for their pursuit of union membership. The Board order required the Company principally to cease and desist from inter-

fering with its employees' statutory rights and to bargain with Local 32B–32J, Service Employees International Union, AFL–CIO (the "Union"), as the bargaining representative of its employees in an appropriate unit. In opposition to the petition for enforcement, the Company contends principally that the Board's finding that it engaged in unfair labor practices should be overturned and that, in light of 100% employee turnover in the bargaining unit, a bargaining order is inappropriate. We reject both contentions and grant the petition for enforcement.

## I. BACKGROUND

Prior to February 1983, the Company employed a three-person maintenance crew, consisting of Carlos Casal, Mario Aguila, and Daniel Santos, for the care of a 45-building apartment complex operated by the Company. Each of the three had been employed by the Company for a number of years without any substantial complaint as to their performance. According to the testimony of these employees, which was expressly credited by the Board's Administrative Law Judge ("ALJ"), the following events occurred in early 1983.

### A. *The Events*

In January 1983, Casal, Aguila, and Santos joined the Union and signed cards authorizing the Union to represent them in collective bargaining. The Union mailed receipts for the employees' initiation fees to Casal at the Company's office, mistakenly believing this to be Casal's home address. The receipts, in an envelope showing the Union's name and return address and bearing the words "ENCLOSE YOUR UNION BOOK! DO NOT SEND CASH" in capital letters, arrived at the Company's office not later than January 27, or 28, when Casal saw the envelope on Gerald Tillinger's desk.

The envelope was not given to Casal until Wednesday, February 2. On February 4, Casal was summoned to a meeting with Gerald Tillinger and Gordon and was told that the Company could not afford

unions. Casal was instructed to try to persuade Aguila and Santos to leave the Union. When Casal replied that Aguila and Santos would not renounce the Union, Gordon instructed him to tell them that unless they renounced the Union "they will lose their jobs. They have families to support and I'm sure they don't want to lose their jobs.... [E]xplain to them that there will be no job if they join the Union." Gordon also told Casal that if Casal did not cooperate and get them out of the Union, the Company would have to "accept" Casal's "resignation."

Casal conveyed Gordon's message to Aguila and Santos, both of whom told Casal they would remain in the Union. When Casal relayed this response to Gordon and added that he too would remain in the Union, Gordon told Casal, "if you're going to stick to the union, ... then I accept your resignation also." He continued to urge Casal to renounce the Union himself and to persuade the other two to renounce it also. Later that afternoon, when Aguila and Santos went to the Company office to pick up their pay checks, they were discharged— told by Gordon that their jobs were being eliminated.

The Company's version of these events, presented principally by Gordon, was that Gordon told Casal that Aguila and Santos would be discharged because the Company did not need employees to do cleaning, and that because of this, Casal resigned. Gerald Tillinger, who, according to both sides, was present during the pertinent events, did not testify. The ALJ found Gordon to be "a poor quality witness."

On February 8, the discharged employees began picketing the Company's premises. On February 25, Gordon approached them on the sidewalk and told them that they could return to their jobs if they renounced the Union. They continued to picket until mid-April. In the meantime, the Union sent the Company a request to meet and bargain; the Company did not respond. The Company proceeded to hire six persons to perform the work of the discharged employees. One was hired in

February, two in early April, and the others in June and August. None of the replacements was a union member.

On June 8, the Company offered reinstatement to Casal, Aguila, and Santos. All declined.

### B. *The Board's Order*

Unfair labor practice charges were filed by the Union, and a complaint was issued by the Board's Acting Regional Director. Following a hearing, the ALJ found the facts as set forth above and concluded that the Company had violated §§ 8(a)(1) and (3) of the Act by threatening to discharge the three employees unless they renounced their support for the Union and by discharging them because of their union membership. He found that the Company had violated §§ 8(a)(1) and (5) of the Act by refusing to recognize and bargain with the Union. He recommended that the Company be ordered (1) to make the discharged employees whole, (2) to cease and desist from interfering with employees' exercise of their statutory rights, and (3) to bargain with the Union upon request.

In a Decision and Order dated December 14, 1984 ("Board Decision"), the Board unanimously agreed with the ALJ that the Company had violated §§ 8(a)(1) and (3) of the Act and adopted the ALJ's first two recommendations. With one member dissenting, the Board concluded that these violations warranted the issuance of a *"Gissel"* order, *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), requiring the Company to bargain with the Union. The Company was ordered principally to cease interfering with employees' exercise of their statutory rights, and to bargain with the Union. The Board petitions for enforcement of this order.

### II. DISCUSSION

In opposition to the Board's petition for enforcement of its order, the Company contends principally (1) that the finding that the Company unlawfully threatened or discharged the three workers was unwarranted, and (2) that a bargaining order was improper. We find no merit in either contention, and we enforce the order.

■ The Company's challenge to the findings that it engaged in unfair labor practices by threatening to discharge and discharging Casal, Aguila, and Santos because of their adherence to the Union need not detain us long. The Board's findings that an employer has committed unfair labor practices in violation of the Act are entitled to affirmance on review if they are reasonable and supported by substantial evidence in the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Pace Oldsmobile, Inc.*, 681 F.2d 99, 100 (2d Cir.1982) (per curiam) (*"Pace I"*). When its findings are based on the ALJ's assessment of the credibility of the witnesses, they will not be "overturned unless they are 'hopelessly incredible' or they 'flatly contradict' either the 'law of nature' or 'undisputed documentary testimony.'" *NLRB v. J. Coty Messenger Service, Inc.*, 763 F.2d 92, 96 (2d Cir.1985) (quoting *NLRB v. American Geri-Care, Inc.*, 697 F.2d 56, 60 (2d Cir.1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983)).

In the present case, the employees testified to the events as described in Part I above. Their testimony, which was supported by the timing and sequence of events not in substantial dispute, was neither inherently incredible nor disputed by any documentary evidence, and it was expressly credited by the ALJ. The contrary testimony by Gordon, discredited by the ALJ, and the Company's office manager was insufficient to require the ALJ to disbelieve the versions of the events testified to by Casal, Aguila, and Santos. In light of all the testimony, there was plainly substantial evidence in the record to support the Board's findings that the Company threatened to and did discharge its three maintenance employees on account of their union membership.

The Company argues that a bargaining order is nonetheless inappropriate principally on the grounds that (1) the Board did not adequately articulate its basis for issuing a *Gissel* bargaining order, and (2) there has been 100% turnover in the maintenance staff, with none of the new employees having expressed an interest in the Union, and that this turnover was caused by the discharged employees' rejection of the Company's offers of reinstatement. These arguments have no merit.

Under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the Board has discretion to order an employer to bargain with a union not theretofore recognized by the employer if the Board reasonably concludes that serious unfair labor practices by the employer have made it unlikely that a representation election can be conducted free of the taint of those practices. Because a *Gissel*-type bargaining order may impose on the employees a union they have not actually chosen to represent them, we require that such an order be entered " '[o]nly where there is a substantial danger that employees will be inhibited by the employer's conduct from adhering to the union,' " *NLRB v. Pace Oldsmobile, Inc.*, 739 F.2d 108, 110 (2d Cir.1984) (*"Pace II"*) (quoting *J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 154 (2d Cir.1981)), and " 'only when the Board demonstrates that an election is unlikely to reflect the uncoerced preference of the bargaining unit,' " *Pace II*, 739 F.2d at 110 (quoting *NLRB v. Marion Rohr Corp.*, 714 F.2d 228, 230 (2d Cir.1983)). Fundamental intrusions into employee rights—" 'hallmark' violations"—"will support the issuance of a bargaining order unless some significant mitigating circumstance exists." *NLRB v. Jamaica Towing Inc.*, 632 F.2d 208, 212 (2d Cir.1980). Threats of discharge of union adherents are hallmark violations, *id.* at 212–13; employee turnover may be a mitigating circumstance, *NLRB v. Windsor Industries, Inc.*, 730 F.2d 860, 867 (2d Cir.1984).

Further, we have refused to enforce *Gissel* bargaining orders in cases where the Board has not set forth findings and analysis that support the imposition of such an order. *See, e.g., Pace II*, 739 F.2d at 110–12; *NLRB v. Heads & Threads Co.*, 724 F.2d 282, 289 (2d Cir.1983); *Pace I*, 681 F.2d at 101–02. We consider it sufficient, however, if the ALJ has provided such findings and analysis and the Board has indicated its adoption of them. *See NLRB v. Windsor Industries, Inc.*, 730 F.2d at 866; *NLRB v. Horizon Air Services, Inc.*, 761 F.2d 22, 24 n. 1 (1st Cir.1985); *Kenworth Trucks of Philadelphia, Inc. v. NLRB*, 580 F.2d 55, 62–63 (3d Cir.1978). All of the requirements for enforcement of a *Gissel* order have been met here.

■ The rationale for the present order was spelled out in the Board's decision principally in its adoption of the ALJ's decision. The ALJ noted, *inter alia*, that at no time had the Company challenged the status or authority of the Union to represent the employees, that it had deliberately flouted the Act for the express purpose of avoiding its statutory bargaining obligation, and that its actions had a continuing "restraintful [*sic* ] and coercive" effect after the discharge of the old employees and the hiring of the new. The Board adopted the ALJ's findings and reasoning, elaborating as follows:

> For the reasons the judge stated, we agree that a *Gissel* bargaining order is clearly warranted to remedy the Respondent's unfair labor practices, which the judge aptly described as the "unlawful discharge of an entire bargaining unit, lock, stock and barrel, for the express purpose of avoiding the statutory bargaining obligation." We also agree with the judge's rejection of the Respondent's argument that a bargaining order should be denied because all three discriminatees declined reinstatement, and thus there has been substantial "employee turnover." As the judge pointed out, the Respondent's contention has "a hollow ring" because the "employee turnover" in this case was a direct and obvious product of the Respondent's own unlawful conduct.

Board Decision at 1–2 (footnotes omitted). This sufficed to explicate the Board's decision to issue a *Gissel* bargaining order.

We find no abuse of discretion in the conclusions of the Board and the ALJ that such an order was appropriate. The Company's threats to discharge Aguila and Santos if they did not repudiate the Union, its threat to discharge Casal if he did not persuade them to do so and did not renounce the Union himself, and its discharge of the men upon their refusals, were plainly "hallmark" violations. The fact that the Company's maintenance work force has had a 100% turnover is not, in the circumstances of this case, a mitigating factor. First, the fact that there has been such turnover does not necessarily mean that a fair election could now be held. Three of the six new employees were hired while the discharged employees were picketing the Company. The new employees presumably are thus aware of the employer's past treatment of its employees who chose to be represented by a union, and the Board was well within the bounds of discretion to view that history as making the likelihood of an untainted election remote.

More important, the 100% turnover here is not a factor that mitigates against a bargaining order because the turnover was caused by the very unfair labor practices sought to be remedied. It would defy reason to permit an employer to deflect a *Gissel* bargaining order on the ground of employee turnover when that turnover has resulted from the employer's unlawful discharge of all of the members of the bargaining unit.

Finally, we reject the Company's contention that responsibility for the 100% turnover should be placed on the discharged employees and not on the Company on the premise the employees were offered, and declined, reinstatement. There was no meaningful offer of reinstatement here. Gordon's first "offer" to the discharged employees was conditioned upon their renunciation of the Union. It plainly could not alleviate the unlawfulness of the discharge, which was likewise bottomed on the employees' refusal to renounce the Union. The June 1983 offers of reinstatement, made more than four months after the employees were discharged, were so belated that the Board was justified in not construing them as a good faith attempt to rehire these men. The Company knew the men had families to support; it had cited this fact in initially threatening discharge. It was reasonable to expect that they could not wait four months before seeking alternative employment. Further, by the time these offers were made, the Company had already hired three persons to replace the three discharged employees. Accordingly, the purported offers of reinstatement did not constitute a mitigating circumstance sufficient to prevent issuance of a bargaining order.

We have considered all of respondents' arguments in opposition to the petition for enforcement and have found them to be without merit.

## CONCLUSION

The Board's order of December 14, 1984, is in all respects enforced.