**KINNEY DRUGS, INC., Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

**Nos. 1647, 1932, and 1933, Dockets 94–4133, 94–4157, and 94–4189.**

United States Court of Appeals, Second Circuit.

Argued May 22, 1995.

Decided Jan. 24, 1996.

---

Thomas J. Grooms, Syracuse, NY (Joseph C. Dole, Bond, Schoeneck & King, Syracuse, NY, on the brief) for petitioner-cross-respondent.

Margaret Gaines Neigus, Supervisory Attorney, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Deborah E. Shrager, Attorney, National Labor Relations Board, Washington, DC, on the brief) for respondent-cross-petitioner.

Before: VAN GRAAFEILAND, KEARSE, and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

Respondent-cross-petitioner the National Labor Relations Board ("Board" or "NLRB") has issued an order (1) finding that during a 1991 union organizing election petitioner-cross-respondent Kinney Drugs, Inc. ("Kinney") engaged in unfair labor practices sufficiently egregious as to justify a bargaining order, and (2) overruling challenges to certain ballots. When the challenged ballots were opened, the NLRB declared the union the winner of the election. The NLRB later issued a second bargaining order upon a finding that Kinney had again engaged in

unfair labor practices by refusing to bargain with the union after the election results were certified.[1]

In this appeal the NLRB seeks enforcement of its bargaining orders, and Kinney asks us to reject the NLRB's findings that (1) Kinney engaged in unfair labor practices justifying the issuance of the initial bargaining order, and (2) the challenged ballots were cast by permanent employees, as opposed to temporary workers (as Kinney claimed), and that the election therefore was won by the union. Were we to agree with the NLRB on either of these issues, we would enforce the orders requiring Kinney to bargain with the newly formed collective bargaining unit. However, we reject the NLRB's conclusion that Kinney's conduct during the course of the 1991 election justified issuance of a bargaining order, and we conclude that the NLRB erred in failing to uphold Kinney's challenges to some—though not all—of the secret ballots cast in the election. We are unable to ascertain the ultimate election result because the record does not disclose how each of the challenged ballots was voted. We therefore remand to the NLRB for further proceedings consistent with this opinion.

## BACKGROUND

Kinney sells pharmaceutical and other products at stores in Vermont and northern New York. This appeal arises out of a November 22, 1991 election in a stipulated unit at a Kinney warehouse and distribution center in Gouverneur, New York. The election was held to determine whether the Kinney warehouse employees wished to be represented by Local 687, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "union"). A total of 41 employees cast votes in the election. Kinney challenged six of these ballots and the union

challenged one. Only Kinney's challenges are pursued on appeal. When the unchallenged 34 ballots were opened immediately following the election, they split 17 for the union and 17 against it. Since this tie vote defeats union certification, the challenged ballots have become potentially determinative.

Administrative Law Judge Joel A. Harmatz conducted hearings in June 1992 and issued his decision in June 1993, (1) finding that Kinney had committed numerous unfair labor practices that warranted the issuance of a bargaining order and (2) rejecting the challenges lodged against all seven contested ballots. The NLRB adopted virtually all of the ALJ's report in an order dated July 12, 1994.[2] The seven contested ballots were then opened. Five were cast for the union and two were cast against it. The final vote was therefore 22–19 in favor of the union. The election was by secret ballot, and there is no indication in the record on appeal as to how any individual voted. The July 12 NLRB ruling also found that during the course of the election, Kinney had engaged in various unfair labor practices. Based on Kinney's unfair labor practices, the NLRB issued a bargaining order compelling Kinney to negotiate with the union without regard to the vote (the "July 12, 1994 bargaining order").

On August 3, 1994, the Board's General Counsel certified the union as the employee's collective bargaining representative. On August 23, 1994, the NLRB's General Counsel filed a complaint alleging that Kinney was continuing its unfair refusal to bargain. The Board granted summary judgment in favor of the General Counsel on September 30, 1994 and for the second time, ordered Kinney to recognize the union (the "September 30, 1994 bargaining order").

---

1. Board orders in representation elections are generally not directly reviewable by the federal courts. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 476, 84 S.Ct. 894, 896, 11 L.Ed.2d 849 (1964). Thus, "to obtain judicial review of such an order, an employer must refuse to bargain with the union after the union has been certified, and then argue its case in a court of appeals after the Board has found the employer to have committed an unfair labor practice." *Goethe House*

*N.Y., German Cultural Ctr. v. NLRB*, 869 F.2d 75, 77 (2d Cir.), *cert. denied*, 493 U.S. 810, 110 S.Ct. 52, 107 L.Ed.2d 21 (1989).

2. Although the findings of the NLRB and the ALJ are virtually identical, throughout the remainder of this opinion we generally attribute these findings and conclusions to the NLRB, the agency whose actions we directly review in this appeal.

*The Election.* The union formally demanded recognition on September 25, 1991 and filed its election petition on October 3. Two unsuccessful organizing efforts had been made at the same Kinney warehouse, one in 1973 and another in 1977.

Richard Cognetti, who had recently been promoted from senior vice president of Kinney to president and chief executive officer, summoned the warehouse employees to a meeting on the afternoon of October 9, 1991. About 30 attended. According to the testimony of several of the employees in attendance, Cognetti displayed the election petition and announced that it upset him. He told the employees that, by law, the filing of the petition barred him from making any changes in response to employee grievances until after the election. With that caveat, Cognetti said he still would be willing to discuss any issues of importance to them. The concerns expressed covered a range of topics, including employee-management communications and the employees' coffee privileges. The NLRB found that this meeting constituted an impermissible solicitation of grievances:

> While the record is devoid of any specific, concrete promise, there remained a clear implication that [Cognetti] would attempt to change things around.

Appendix ("A.") at 96. Sometime thereafter, several changes were instituted at the Kinney warehouse, including increased availability of coffee and the promotion of several part-time workers to full-time status.

Cognetti gave a second speech to the warehouse employees on October 25, 1991. This speech, which was not deemed by the NLRB to have constituted an unfair labor practice, covered two topics: the disruption caused by ongoing warehouse renovations and the downside of union representation. As part of these remarks, Cognetti stated:

> Unionization is a long-term proposition; once you get into it, it is very difficult to get out. The union is going to want dues, assessments and initiation fees, and whatever other charges they have regardless of what they are able to accomplish. And, a union can't practically do a number of things relating to our situation. Unions

can't stop technological change, they can't stop layoffs (but fortunately we don't have those around here); they can't stop customers complaints; and they can't stop the pressures that sometimes come because of the needs of business.

A. at 653. This speech was followed by a letter to the workers dated November 5 in which Cognetti repeated his views on unionization. A. at 649–50.

Between November 11 and 14, Kinney management scheduled a series of meetings with the warehouse employees. Attendance at these group sessions, held during work hours, was mandatory. The meetings were run by Cognetti together with either Kinney's director of human resources Ronald Field or Wayne Frenyea, Kinney's vice president of finance. According to Kinney, employees at each meeting were told that management was barred from taking any corrective actions during the campaign. In some of the meetings, reference was made to the health of Kinney's pension fund and the underfunding of the union plan. During at least one of the meetings, Cognetti became annoyed at the sounding of a buzzer that had been installed years earlier to announce the start of shifts. Cognetti ordered that the buzzer be silenced permanently, a step cited by the NLRB as an example of an improper and coercive management concession during the course of the union campaign, and classified as an unfair labor practice. The NLRB also found that, during these group meetings, Cognetti allegedly told older employees that they had the most to lose if the union won because they were already fully vested in Kinney's fully-funded retirement program. The NLRB cast this as a threatened loss of benefits and called it an unfair labor practice.

On November 13, supervisor Dave McClure allegedly told employee Donald Bush that, if the union won the election, Kinney would close the warehouse and hire an outside trucking firm to replace it. As credited by the NLRB, employee Donny Richards overheard McClure telling Bush:

> [I]f we went Union ... they were going to hire Walsh Trucking to bring the freight directly to the store.... [I]t would be for

two percent over cost and it would be cheaper than us shipping it out from the warehouse. And ... as far as the warehouse goes, it would be history.

A. at 110.

The NLRB further found that on the same day Cognetti met individually with employees Otis Woods and Les McClure (the brother of supervisor Dave McClure). At that meeting Cognetti allegedly accused them of union organizing and threatened them with discharge unless they switched sides. The next day, Woods and Les McClure called an employee meeting to report Cognetti's alleged demand that they instruct their co-workers to vote against the union. They also reported Cognetti's threats against their jobs.

Cognetti testified that he had heard rumors that these threats had been made, that he immediately instructed his management team to tell the employees that no employee's job was at risk because of union activity, and that he repeated this pledge at a meeting held on November 19. In a letter dated the same day, Cognetti gave the following assurances:

> Kinney Drugs, Inc. guarantees that, as long as *LES McCLURE* and the other employees who were the principal union organizers perform their job in a reasonably satisfactory manner, the Company will continue their employment as warehouse employees of this Company and will not take any steps to cause termination of the employment relationship. This guarantee may be enforced by a New York court having jurisdiction over the parties.
>
> This guarantee applies only to the situation where the Teamsters Union loses the November 22, 1991 election and is not thereafter certified as the collective bargaining representative. Also, because the Company cannot guarantee lifetime employment, this guarantee will be limited to a three-year duration, and will also not apply in the event the Company completely ceases warehousing operations in New York State.

A. at 589–90. Kinney claims that this letter was prompted by an unfounded "hit list" rumor created by the union organizers rather than by any actual threat made by Cognetti or any other member of Kinney management.[3]

The union responded to Kinney's November 19 letter the following day with one of its own:

> In reviewing the actions of your Employer in the past few weeks it should be obvious to everyone that he is willing to do anything to prevent you from voting on Friday, November 22, according to how *YOU* personally feel about the Union.
>
> First, they have tried talking to you one on one or in small groups, to find out how *YOU* felt about the Union and what the problem's [sic] were. Once they felt they knew your concerns they indicated that these concerns could certainly be taken care of, but without the need of a Union to do so.
>
> Since this tactic was not completely successful Mr. Cognetti began to threaten some of you and scaring others that if you voted for the Union then you would be fired or perhaps the Warehouse might soon close or move. It's fairly evident now that management realizes this tactic backfired. As a result they have now changed their tune once again.

A. at 549.

The NLRB found that a number of the actions taken by Kinney constituted unfair labor practices in violation of 29 U.S.C. § 158(a)(1). According to the NLRB order, Kinney violated the labor laws in the following ways, among others:

> * Threatening to close the warehouse if the union won the election.
>
> * Threatening employees Woods and Les McClure with discharge unless they supported management.
>
> * Soliciting grievances with implicit or explicit promises to rectify them.

---

**3.** The ALJ found that the allegations of the "hit list" rumors did not amount to an unfair labor practice committed by the union.

* Taking corrective action in response to complaints raised by employees during the course of the election.

 * Threatening loss of benefits.

 * Interrogating various employees regarding their position on the union and the election.

*The Contested Ballots.* The warehouse employees cast their ballots on November 21. If only the unchallenged ballots are counted (17 for the union and 17 against), the union is not entitled to certification. Thus, the result of the union campaign may turn on the validity of these contested ballots. Kinney challenged six of the ballots on the ground that they were cast by "temporary employees" hired until such time as a warehouse automation project could be completed. According to Kinney, these employees therefore were not entitled to vote in the election because (1) a stipulation signed by the union and Kinney specifically excluded temporary employees from the group of employees eligible to participate in the election, and (2) as a matter of law, temporary employees are excluded from representation elections.

In late 1990, Kinney had contracted with IBM to install a warehouse automation system. The installation was initially scheduled to be completed by September 16, 1991. Some warehouse activities had to be relocated in the meantime, with an attendant loss of operational efficiency. In March 1991, Kinney hired six additional employees. Kinney contends that they were hired solely to alleviate the temporary problems caused by the installation of the new system, and that the six were scheduled to be terminated when the installation was completed.

In August 1991, IBM revised its projected completion date to January 1992.[4] Around the same time, five of the six workers who had been hired in March had resigned, and Kinney replaced them with what it terms new "temporary" employees.

Prior to the election, Kinney and the union entered into a stipulation that specifically excluded "temporary employees" from the bargaining unit, without specifying who they

were. Under the stipulation, the following employees were deemed eligible to vote in the election:

> All full-time and regular part-time truck drivers and warehouse employees including plant clerical employees employed by the Employer at its ... warehouse facilities, *but excluding* office clerical employees, professional employees, *temporary employees,* guards and supervisors as defined in the Act.

A. at 8 (emphasis added).

On appeal, Kinney argues that all six of the employees in question should be classified as "temporary" because (1) at the time of the election, management intended to dismiss them after the completion of the IBM project, (2) their temporary status is confirmed by their minimum-wage salary and their ineligibility for benefits, and (3) Kinney's internal employment records reflect that they were hired as temporary employees. The NLRB rejected the company's classification, noting that after the election a number of the original six "temporary employees" were eventually reclassified as permanent employees. In addition, the NLRB credited the testimony of two of these employees, who recalled being given the impression that they were being hired as regular, full-time employees. Although allowing that Kinney management might have intended to hire these workers on a temporary basis, the NLRB concluded that Kinney had failed to convey that fact to the workers. Thus, the NLRB held that the six ballots were valid because the employees themselves were unaware of their temporary status: "At no time, prior to the election, did the Employer ever see fit to inform the disputed employees that their employment was anything short of indefinite." A. at 114. The counting of the challenged ballots brought the final tally to 22–19 in favor of the union.

## DISCUSSION

We review in turn (1) the findings of unfair labor practices committed by Kinney during the 1991 election campaign and the resulting

---

**4.** In its brief on appeal, Kinney identifies the anticipated January 1992 completion date as January 2. The NLRB's opinion, however, identifies it as January 30.

bargaining order and (2) the Board's rejection of Kinney's challenge to six of the ballots cast in the election.

■■■ We uphold the NLRB's factual findings if they are supported by "substantial evidence." *Local One, Amalgamated Lithographers of America v. NLRB*, 729 F.2d 172, 175 (2d Cir.1984). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and internal quotations omitted). Even if a court "could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence." *Id.* When the NLRB's findings are "based on the ALJ's assessment of the credibility of witnesses, they will not be overturned unless they are hopelessly incredible or they flatly contradict either the law of nature or undisputed documentary testimony." *NLRB v. Gordon*, 792 F.2d 29, 32 (2d Cir.), *cert. denied*, 479 U.S. 931, 107 S.Ct. 402, 93 L.Ed.2d 355 (1986) (citations and internal quotations omitted). Nevertheless, substantial evidence "is more than a mere scintilla." *Local One*, 729 F.2d at 175 (citations and internal quotations omitted). The NLRB's affirmance of the ALJ's factual findings is subject to this deferential standard of review.

## A. The Alleged Unfair Labor Practices.

The NLRB's July 12, 1994 bargaining order was based on the ALJ's finding that Kinney management had engaged in unfair labor practices so egregious as to foreclose irreparably the prospect of a fair second election. On appeal, Kinney argues (1) that the NLRB's findings of unfair labor practices were unsupported by substantial evidence and (2) that even if the NLRB's findings were supportable and the union's allegations were accepted as true, a bargaining order was an unwarranted and excessive remedy.

### 1. Section 8(a)(1) violations.

■■■ Section 7 of the National Labor Relations Act grants employees the right "to self-organization, to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collec-

tive bargaining or other mutual aid or protection...." 29 U.S.C. § 157. Section 8(a)(1) of the Act deems it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their Section 7] rights...." 29 U.S.C. § 158(a)(1). Under certain circumstances, explored in some detail below, serious violations of § 8(a)(1) can justify an order requiring the employer to bargain with a union that did not win the organizing election. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■■■ Section 8(a)(1) is violated if "the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *NLRB v. Okun Brothers Shoe Store*, 825 F.2d 102, 105 (6th Cir. 1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). A court making this assessment takes into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel*, 395 U.S. at 617, 89 S.Ct. at 1942. Among the many forms of misconduct that violate § 8(a)(1) are threats of discharge in retaliation for union activity, *Gordon*, 792 F.2d at 32, "grants or promises to grant benefits to discourage employee support for a union," *NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 96 (2d Cir.1985), the cultivated impression that employees' union activities are under surveillance, *NLRB v. Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 296–97 (2d Cir.1972), coercive interrogations of employees concerning their union activity, *NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 939–40 (2d Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978), and, in certain circumstances, threats of plant closure. *J. Coty Messenger Serv.*, 763 F.2d at 97; *NLRB v. General Stencils, Inc.*, 438 F.2d 894, 900 (2d Cir.1971).

■■■ Nevertheless, "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *Gis-*

*sel*, 395 U.S. at 617, 89 S.Ct. at 1941. Section 8(a)(1) leaves "an employer ... free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Id.* at 618, 89 S.Ct. at 1942. Indeed, as we have previously acknowledged, "[t]his First Amendment right is embodied in § 8(c) [of the National Labor Relations Act], which allows the employer to express 'any views, argument, or opinion' in any media form without committing an unfair labor practice provided that 'such expression contains no threat of reprisal or force or promise of benefit.'" *NLRB v. Pratt & Whitney Air Craft Div., United Technologies Corp.*, 789 F.2d 121, 134 (2d Cir.1986) (footnotes omitted). "Granting an employer the opportunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions...." *Id.*

### 2. Gissel *bargaining orders.*

█ A bargaining order can be an acceptable response to a series of unfair labor practices "which have made the holding of a fair election unlikely...." *Gissel*, 395 U.S. at 610, 89 S.Ct. at 1938. But such an order is only an "appropriate remedy for those practices [that] ... are of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had.'" *Id.* at 614, 89 S.Ct. at 1940 (quoting *NLRB v. S.S. Logan Packing Co.*, 386 F.2d 562, 570 (4th Cir.1967)).

█ In this circuit, "[a]n election, not a bargaining order remains the preferred remedy." *J.L.M., Inc. v. NLRB*, 31 F.3d 79, 83 (2d Cir.1994). "[A] bargaining order is a rare remedy warranted only when it is clearly established that traditional remedies cannot eliminate the effects of the employer's past unfair labor practices." *Id.* Our review of a bargaining order is for abuse of discretion. *America's Best Quality Coatings Corp. v. N.L.R.B.*, 44 F.3d 516, 520 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995).

In *NLRB v. Windsor Industries, Inc.*, 730 F.2d 860 (2d Cir.1984), we analyzed the framework erected by *Gissel* and concluded that bargaining orders are proper remedies in two kinds of cases:

> The Court first identified those cases, described in *Gissel* as "exceptional," which were "marked by 'outrageous' and 'pervasive' unfair labor practices." In these cases an order to bargain might issue irrespective of whether the union had ever demonstrated majority support.

> *Gissel* also recognized a second tier of "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes," and which might therefore call for the issuance by the Board of a bargaining order. In fashioning remedies in those cases, involving a "lesser showing of employer misconduct," the Board "can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." The Court then stated that if the Board finds "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue...."

*Id.* at 865 (quoting *Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940–41).

█ The *Gissel* category of "exceptional misconduct" is limited to what are termed "hallmark" violations. *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 272 (2d Cir.1981). "Such violations include closing of a plant or threats of closure or loss of employment, granting of benefits to employees, or reassignment, demotion or discharge of union adherents." *Id.* The only violations by Kinney that potentially amount to exceptional misconduct are the threat of plant closure and the threat to discharge Woods and Les McClure. The second *Gissel* category applies to a group of more pallid unfair labor

practices such as "interrogation of employees, promises of benefits, expressions of anti-union resolve, or threats of decreased benefits. . . ." *Id.* Such "lesser misconduct" "will not support a bargaining order absent serious and long-lasting untoward effects on employees." *Id.* Most of the unfair labor practices cited by the NLRB in this case—from the interrogation of employees to the marginally more generous coffee policy—are of this lesser variety.

### 3. Kinney's alleged "hallmark" violations.

We consider in detail the two "hallmark" violations that arguably constitute exceptional misconduct under *Gissel.*

 *a. The threat to close the warehouse.* The NLRB found that supervisor Dave McClure, in a one-on-one conversation, told employee Donald Bush that if the union won the election, the warehouse might be shut down. To make this finding, the NLRB had to credit the hearsay testimony of employee Donny Richards, who claims to have overheard the McClure–Bush conversation in the busy warehouse from a distance of 15 to 20 feet. Kinney challenges this finding and argues that it was not supported by substantial evidence. We need not rule on that objection because we hold that the statements found to have been made do not constitute an unfair labor practice.

 An employer is entitled to tell its employees what it believes will be the likely economic consequences of unionization, even if these consequences include the possibility of plant closure:

> [The employer] may ... make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic

necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Gissel,* 395 U.S. at 618, 89 S.Ct. at 1942 (citations omitted).

Kinney had decided, McClure allegedly told Woods, that it might be cheaper to replace the warehouse functions with an outside trucking firm if the warehouse employees formed a union. Such a statement is the type of "reasonable prediction" based on "economic necessities" envisioned by *Gissel.* Kinney had the right to spell out the possible economic consequences of unionization; and Kinney's employees, who could hardly rely on the union for a neutral view, had a profound interest in receiving that information. The labor laws do not suppress one side of the debate. The NLRB therefore erred in finding that the McClure–Bush conversation constituted a violation of § 8(a)(1).

 *b. The threatened discharges.* The other arguably hallmark violation committed by Kinney involved Cognetti's threat to fire Les McClure and Otis Woods unless they gave active support to management in the election. Kinney does not dispute that a threat to discharge an employee because of the employee's union activities constitutes a violation of § 8(a)(1), *see Gordon,* 792 F.2d at 32, but Kinney does challenge the NLRB's factual finding: first, on the ground that the ALJ denied Kinney an adequate opportunity to cross-examine employee Woods and therefore should not have considered this testimony in rendering his findings; and, second, on the ground that the detrimental effect of any threat was alleviated by subsequent guarantees of job safety.

The NLRB credited testimony to the following effect: Cognetti spoke one-on-one with both Woods and Les McClure on November 13, accused them of aiding the union, ordered them to call an employee meeting to discourage their co-workers from voting for the union, and threatened both with discharge if they did not comply with his orders. A. at 102–08.

Kinney contends that the NLRB's findings should be disregarded because the NLRB curtailed Woods' testimony and limited Kinney's opportunity to cross-examine him. Woods had signed an affidavit in November 1991 concerning the threat of discharge. Between the November 1991 election and the June 1992 NLRB hearing, Woods was promoted to supervisor. At the ALJ hearing, Woods became hesitant when he was called upon to give testimony that might hurt Kinney. Recognizing that Woods' new role put him in a delicate position, the ALJ allowed the union to submit the November 1991 affidavit, and relied upon this affidavit in making findings of fact. Kinney argues that the ALJ essentially cut off Woods' testimony in such a manner so as to preclude Kinney from effectively cross-examining him. This challenge is meritless. Although the ALJ evidently accepted Woods' affidavit in lieu of his direct testimony, at no point did the ALJ prevent Kinney from cross-examining Woods concerning the substance of his November 13 meeting with Cognetti. Kinney simply elected not to do so. The NLRB did not err in relying on Woods' testimony and affidavit.

The union also sponsored testimony from several employees who attended a meeting on November 14, at which Woods and Les McClure told the gathering about the threats of discharge. Kinney contends that these threats (or rumors of threats, as Kinney claims) were effectively repudiated by subsequent management actions. According to Cognetti's testimony, he gave a speech on November 19 in which he pledged that "nobody would be fired whatever the outcome of the election." A. at 475. This testimony was uncontradicted, but the NLRB specifically refused to credit it. The NLRB did find, however, that Cognetti sent a letter to all warehouse employees on November 19 which "guarantee[d] that, as long as ... the ... employees who were the principal union organizers perform their job in a reasonably satisfactory manner, the Company will continue their employment as warehouse employees of this Company and will not take any steps to cause termination of the employment relationship." A. at 589. According to the letter, this assurance was effective only if the union *lost* the election.

In the past the NLRB has acknowledged that an employer can effectively repudiate unlawful conduct if the repudiation is "timely, unambiguous, specific in nature to the coercive conduct and free from other proscribed illegal conduct." *Passavant Memorial Area Hospital,* 237 N.L.R.B. 138, 138, 1978 WL 7798 (1978) (citations and internal quotations omitted); *see also Wilson Trophy Co. v. NLRB,* 989 F.2d 1502, 1511 (8th Cir.1993). The NLRB found that the November 19 letter was an ineffective repudiation:

> The November 19 document would have been taken by employees as the best evidence of Cognetti's intentions. Yet, it did not address the predictable concerns generated by his conduct of November 13, which he had not previously recanted, retracted, denied or even addressed in any prior communication with the work force as a whole or individually. The limited assurance that union supporters would be spared if the Union were defeated, in this context, by negative implication, reenforced the likelihood, in the eyes of employees, that the Respondent would take retaliatory action if the Union were designated. Accordingly, the November 19 message was drafted in terms likely to perpetuate and give continuing validity to the previously communicated threat that McClure and other "union supporters" were endangered by the possibility of a union victory.

A. at 109–10. The NLRB thus reads Cognetti's letter with a jaundiced eye. The letter disclaims any intent to retaliate in the event of a union defeat. It therefore responds to the fear that pro-union employees may become vulnerable to reprisal without union protection. But the NLRB reads this specific assurance as a negative pregnant that reinforces the original threat. However, because our inquiry is restricted to the question of whether the NLRB's findings are supported by substantial evidence, we accept the finding that Kinney engaged in the unfair labor practice of an unrepudiated threatened discharge.

*4. The appropriateness of a bargaining order in this case.*

■ At worst, Kinney committed one sustainable hallmark violation during the

course of the 1991 election, plus an assortment of lesser infractions.[5] Given the facts of this case, the bargaining order issued by the NLRB was an abuse of discretion.

■ As discussed above, *Gissel* bargaining orders may be issued either (a) if an employer has engaged in exceptional misconduct, or (b) if the employer has engaged in lesser misconduct under *Gissel*, and the union can demonstrate that "(1) the union was at some point supported by a majority of the bargaining unit employees; and (2) the employer's unfair labor practices undermined the union's majority strength and 'the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight.' " *J.L.M., Inc. v. NLRB*, 31 F.3d 79, 83 (2d Cir.1994) (quoting *Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940–41). This case falls into neither of these categories.

*a. Exceptional Misconduct.* Not every "hallmark" violation amounts to exceptional misconduct under *Gissel*. In *Windsor*, for example, we found that the *actual* dismissal of two employees did not rise to that "outrageous" level:

> While the unlawful layoffs violation, if not "outrageous," is certainly a "hallmark" violation as that term has come to be used in this circuit, in no sense can the violation be said to be "pervasive" under *Gissel*; this was essentially one layoff, albeit of two men. This [is] not ... a "class one" case....

*Windsor*, 730 F.2d at 865 (citations omitted). *A fortiori*, Kinney has engaged in no exceptional, pervasive, and outrageous behavior: a threat is by nature less outrageous than actual dismissal; actual dismissal is a management message calculated to reach all the members of the unit whereas Kinney's threat was made to two employees and disseminated to others by them, not by Kinney; and

Kinney acted to limit its threat, whereas the employer in *Windsor* took no remedial action until *after* unfair labor charges had been filed.

*b. Lesser Misconduct.* If the Board's bargaining order is to be enforced, it must satisfy the requirements outlined by *Gissel* for cases marked by a lesser degree of misconduct than exceptional hallmark violations. The Board must first establish that there existed majority "employee sentiment once expressed through cards" in favor of the union. *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940. Twenty-five signature cards are included in the record. The unit contained 41 individuals, including the seven whose votes were contested.[6] We conclude below that the NLRB erred in rejecting Kinney's challenges to four of the seven contested ballots. Of these four employees, two had signed cards. Retrospectively, therefore, the original unit consisted of 37 individuals, a majority of 23 of whom signed cards.

Of these 23 cards, Kinney challenges five that were signed by employees who testified that they signed because they believed the only consequence of doing so would be the authorization of an election, and not necessarily because they wanted to vote in favor of a union. However, a review of the transcript pages cited by Kinney does not support this allegation. All five of the employees who signed these ballots indicated that they favored a union.

Kinney further contends that two additional signatures were induced by the false assertion that a majority of the other employees had already signed the cards. However, the NLRB deems this false statement to be within the range of "puffery" that solicitors are allowed. *See Montgomery Ward & Co.*, 288 N.L.R.B. 126, 128–29, 1988 WL 213700 (1988). Finally, Kinney points out that three of the 23 cards were signed after the union made its formal demand for recognition on

---

**5.** For purposes of the analysis below we assume, *without holding*, that the NLRB's findings regarding Kinney's other alleged unfair labor practices (none of which were even arguably hallmark violations) were supported by substantial evidence.

**6.** Both parties appear to assume that the unit consisted of only 40 individuals. Yet, the parties

September 25. *See* A. at 604, 612, 636.[7] It is questionable whether these cards may be included in the final count, *see Tall Pines Inn, Inc.,* 268 N.L.R.B. 1392, 1406, 1984 WL 36122 (1984), but the exclusion of these three cards would reduce the total number of valid cards to 20, which is still a majority of 37.

Nevertheless, even if the union had majority support in September 1991, the bargaining order was an excessive remedy. Absent exceptional misconduct (as defined in *Gissel* ), a bargaining order is justifiable only if "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies ... is slight." *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. The test is whether or not "a fair and reliable election can be had." *Id.* (citations and internal quotations omitted).

The finding of a hallmark violation such as the threats to Woods and Les McClure, does not necessarily justify a bargaining order, even in the absence of mitigating factors. *Windsor,* 730 F.2d at 866. Here, however, Kinney's hallmark violation was substantially mitigated by Cognetti's November 19 letter, which disclaimed any reprisal *in the event the union lost.* The NLRB concluded that the November 19 letter was an ineffective repudiation because it was not categorical, but the NLRB erred in failing to consider the letter's substantial mitigating effect. A union victory would reduce management's ability to take reprisals with impunity, as any union supporter would assume. When Woods and Les McClure called a meeting to publicize the threat to their jobs, union adherent Drew Koerick stepped up to tell the audience that the only way to protect Woods and McClure from discharge was to vote for the union. Since union supporters would be (or feel) most vulnerable if the union lost, Cognetti's letter thus disclaimed management's most potent threat.

■ In considering whether to enforce a bargaining order in the absence of exceptional misconduct, courts may also consider

whether the alleged violations involved acts or mere threats to act, *see NLRB v. Jamaica Towing, Inc.,* 632 F.2d 208, 214 (2d Cir.1980), as well as "lapse of time, employee turnover and other significant factors." *Windsor,* 730 F.2d at 867. "The ultimate analysis must focus on whether a bargaining order is appropriate under the conditions facing the Board at the time of its decision." *J.L.M.,* 31 F.3d at 84. Our preference not to enforce a bargaining order in all but the most extreme of circumstances "reflects the important policy that employees not have union representation forced upon them when, by exercise of their free will, they might choose otherwise." *NLRB v. Marion Rohr Corp.,* 714 F.2d 228, 230 (2d Cir.1983). It needs saying that, in a union representation election, the NLRB has no vote.

In *J.L.M.*—a case in which an employee was actually terminated as a reprisal for union organizing—we rejected the Board's bargaining order largely because the Board had failed to consider such circumstances as the intervening lapse of time, and turnover in the unit. Kinney's hallmark violation was far less egregious than that committed by the employer in *J.L.M.,* and Kinney's other alleged labor practices are trivial even in the aggregate. Moreover, the bargaining order in this case was entered without consideration of other circumstances that bear upon fairness: the turn-over in the unit (as to which no inquiry was apparently made) and the thin margin of the vote. In short, the NLRB has "failed to convince us that a bargaining order is warranted...." *See J.L.M.,* 31 F.3d at 85.

We decline to enforce the NLRB's July 12, 1994 bargaining order insofar as it is based upon the unfair labor practices committed by Kinney in connection with the November 1991 election.

## B. The Contested Ballots.

In rejecting Kinney's challenges to the ballots of six of the warehouse workers, the

---

agree that the final vote was 22–19.

**7.** Kinney actually points to four cards that were signed after the union filed its petition. One of these challenged cards, however, was signed by

one of the employees who, because of his status as a temporary employee, as found below, should have been deemed ineligible to vote in the election. A. at 620.

NLRB focused on the employees' perception of their status. Ultimately, the NLRB found no evidence that any of the six were ever *directly* told that they were temporary, and relied on the testimony of five of the six that, during their employment interviews, "no information was provided suggesting that their jobs would be limited in duration by the IBM project or any other contingency." A. at 114. The NLRB also credited the testimony of two of the six employees that each had received "affirmative assurances of indefinite employment" at the time of their hiring. A. at 114. Finally, the NLRB pointed to the fact that four of the six had been given regular, non-temporary positions several months *following* the election.

The NLRB credited but dismissed as unimportant the following evidence that these employees were temporary: Kinney management employees testified that the company had intended the six jobs to be transitory, A. at 112–113; all personnel documents pertaining to the employees reflected temporary status, A. at 113–114; the company's president made a speech on October 25, 1991, in which he referred to "temporary employees" who had been hired for the duration of the IBM transition period, A. at 114 n. 101; the six disputed employees did not appear on the list of qualified voters prepared by Kinney, A. at 112; and the union, which could have contested that list, did not. The NLRB concluded that, because the challenged voters "possessed a reasonable expectancy of continued employment into the indefinite future," they should not be categorized as temporary. A. at 114.

On appeal Kinney argues that the NLRB erred in rejecting the challenges to the six ballots because (1) the election was governed by a stipulation which, when the intent of the parties is considered, demonstrates that the six workers were temporary employees, and (2) NLRB precedent requires that they be classified as temporary.

*1. The Parties' Intent.*

The NLRB did not consider the parties' intent when it interpreted the election stipulation. Kinney argues that the addition of the phrase "temporary employees" to the list of excluded employees was done at the behest of the union in an effort to exclude the ballots of the six employees in question, and as further proof of the parties' intent, Kinney points to the pre-election list of eligible employees, prepared by Kinney and accepted by the union, from which the six employees in question are excluded.

Kinney relies on three Second Circuit opinions in support of its contention that the stipulation should be interpreted with the aid of extrinsic evidence: *NLRB v. Joclin Mfg. Co.*, 314 F.2d 627 (2d Cir.1963); *Tidewater Oil Co. v. NLRB*, 358 F.2d 363 (2d Cir.1966); and *NLRB v. Ortiz Funeral Home Corp.*, 651 F.2d 136 (2d Cir.1981), *cert. denied*, 455 U.S. 946, 102 S.Ct. 1445, 71 L.Ed.2d 659 (1982). These cases stand for the proposition that where a stipulation determines the jobs included and excluded from the bargaining unit, the NLRB is "not making an independent determination of unit membership [but is] construing a contract." *Ortiz*, 651 F.2d at 139; *see also Joclin*, 314 F.2d at 633 (there "the Board was not making an independent determination; it was construing a contract"); *Tidewater*, 358 F.2d at 365 (the Board's "function is limited to construing the agreement according to contract principles").

When a contract is plain on its face, there is no need to consider extrinsic evidence. *International Klafter Co. v. Continental Casualty Co.*, 869 F.2d 96, 100 (2d Cir.1989). In *Joclin, Tidewater* and *Ortiz*, the disputed language of the stipulations was uncontestably ambiguous and uninformed by statute or judicial precedent. *See Joclin*, 314 F.2d at 633–34 (distinguishing between "plant clericals" and "office clericals"); *Tidewater*, 358 F.2d at 364–65 (distinguishing between "pump mechanics" and "maintenance mechanics"); *Ortiz*, 651 F.2d at 137 (defining "receptionists"). To construe these stipulations, the court had to look beyond the language used by the parties. In the Kinney stipulation, by contrast, the disputed term— "temporary employee"—is one that has been the subject of numerous Board and federal court decisions.

The phrasing of the stipulation invites reference to background law: the stipulated

unit included "[a]ll full-time and regular part-time drivers and warehouse employees ... excluding office clerical employees, professional employees, *temporary employees,* guards and supervisors *as defined in the Act.*" A. at 8 (emphasis added). Although Kinney's pre-election list of eligible voters and the union's acceptance of that list constitute evidence as to who the temporary employees might be, the definition of "temporary employees" can be determined by reference to the Act itself and to the body of law construing it.

### 2. Temporary Employees.

■ Eligibility to vote in a union organizing election "depends on whether an employee is sufficiently concerned with the terms and conditions of employment in a unit to warrant his participation in the selection of a collective bargaining agent." *Shoreline Enterprises of America, Inc. v. NLRB,* 262 F.2d 933, 944 (5th Cir.1959). Conversely, persons employed in a bargaining unit during the eligibility period and on the date of the election are eligible to vote. *NLRB v. S.R.D.C., Inc.,* 45 F.3d 328, 331 (9th Cir.1995). This general rule does not, however, confer voting rights on most temporary employees. Because a worker whose anticipated tenure is short and definite is unlikely to share a community of interests with regular permanent workers, courts generally deem these temporary employees "ineligible to be included in the bargaining unit." *Pen Mar Packaging Corp,* 261 NLRB 874, 874, 1982 WL 24502 (1982); *see also S.R.D.C.,* 45 F.3d at 331; *NLRB v. New England Lithographic Co.,* 589 F.2d 29, 32 (1st Cir.1978).

■ The NLRB and the federal courts have had some difficulty designing a consistent test to be used for this purpose. "[A]n employee is ineligible to vote as a 'temporary employee' only if a definite termination date has been established." *United States Aluminum Corp.,* 305 N.L.R.B. 719, 719, 1991 WL 256141 (1991). Under the most recent Board precedent, this definite date may be fixed either by a calendar date *or* by reference to the completion of a specific *task or*

*project. Caribbean Communications Corp.,* 309 NLRB 712, 713, 1992 WL 363320 (1992) (termination tied to the completion of a special filing project); *see also Emco Steel Inc.,* 227 NLRB 989, 991, 1977 WL 8218 (1977) (temporary employees include those hired with "definite terminal dates," "hired for a set term," or hired "to perform a specific project or series of tasks"), *enforced without published opinion sub. nom., Local 810, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. NLRB,* 562 F.2d 38 (2d Cir.1977). This "date certain" test has been endorsed, albeit in a somewhat modified form, by the First Circuit, *see New England Lithographic,* 589 F.2d at 32, and by the Ninth Circuit. *See S.R.D.C.,* 45 F.3d at 331–32. Historically, this "date certain" test has been contrasted with the NLRB's consideration of an "employee's reasonable expectations of permanent employment within the bargaining unit." *S.R.D.C.,* 45 F.3d at 331. Under this "reasonable expectations" approach "an employee whose term of employment remains uncertain is eligible to vote." *Id.* The First and Ninth Circuits have rejected the "reasonable expectations" test when the employee in question is still employed by the company during the election. *Id.; New England Lithographic,* 589 F.2d at 34. In this case, the NLRB made passing reference to both the "reasonable expectations" test and the "date certain" test. Although the First and Ninth Circuits treat these considerations as competing tests and apply only the "date certain" test, we conclude, with the NLRB, that both considerations are relevant to the temporary employee issue.

■ On appeal, Kinney points to factual findings that Kinney hired the contested employees for the purpose of assisting with the added work caused by the IBM automation project (a project of finite duration), paid them less than the "permanent" employees, gave them no fringe benefits, and listed them in the company's personnel files as "temporary".[8] Nevertheless, the NLRB found that this limitation of employment was not expressed directly to the six employees, and

---

**8.** Kinney suggests, and we agree, that the ALJ erred in relying on the fact that later a number of the workers who cast the disputed ballots were hired as full-time, regular employees. *See Pen*

*Mar,* 261 N.L.R.B. at 874. The only relevant inquiry was the status of the employees as of the date of the election.

that therefore Kinney could not rely upon the existence of the IBM project to cast these employees as temporary workers:

> At no time prior to the election, did the Employer ever see fit to inform the disputed employees that their employment was anything short of indefinite. In these circumstances, it is fair to conclude that the challenged voters possessed a reasonable expectancy of continued employment into the indefinite future.

A. at 114. An employee's expectation of future employment certainly has bearing on whether or not the employee in question shares a community of interests with others in the bargaining unit. The Board erred, however, in disregarding evidence that was unrebutted and that the Board itself credited. Specifically, the NLRB disregarded the pre-election eligibility list prepared by Kinney, which omitted the six employees who cast the votes challenged on this appeal, and which was not challenged by the union. That is particularly telling in light of Kinney's offer of proof, accepted by the ALJ, that the union had initially sought the exclusion of temporary employees from the bargaining unit. The Board argues on appeal that the absence of the six disputed names from the eligibility list does not "preclude the Board's consideration of whether they are included in the designated unit." But the Board offers no reason for completely *disregarding* this evidence as a result of that consideration. In light of this circumstance, and after reviewing the evidence bearing upon the status of the six employees who cast disputed ballots, we conclude, as to four of them, that the Board's classification of the employees in question as other than temporary was not supported by substantial evidence.

■ *Sheila Wollman and Diane Fairbanks.* Wollman and Fairbanks were both hired on August 22, 1991. Kinney argues that these hires were part of an effort to ensure that the company would have sufficient temporary labor to see it through the continuation of the IBM renovation project, then scheduled to be completed in January 1992. At the hearing, Wollman testified con-

cerning her job interview with Kirk McCaffrey, the warehouse foreman:

Q. Did [McCaffrey] tell you whether or not you would be full-time or part-time?

A. He said I'd be a regular part-time.

Q. Did he use the word regular?

A. I am not sure if he did. I had asked him whether I would be—if this was just, you know, for part-time and I was going to be laid off, I didn't need a job like that. *And he said no, I would be regular.*

A. at 328 (emphasis added). The NLRB specifically credited this testimony. The Board's rejection of Kinney's challenge to Wollman's ballot is thus supported by substantial evidence.

■ Similarly, Fairbanks testified that she too was hired with the prospect of an indefinite period of employment:

Q. What did you discuss during this initial interview?

A. [McCaffrey] ... explained ... what I would be doing and how many hours I would get a week.

Q. How many hours did he say you would get a week?

A. He said ... thirty to thirty-four.

Q. What else did he say?

A. And sometimes we would probably get over-time and that later on, *probably by next September, I'd be full-time.*

A. at 320–321 (emphasis added). The NLRB credited this testimony along with its implication that Fairbanks would still be employed in September 1992, long after the scheduled completion of the IBM project. Notwithstanding the omission of these names from Kinney's eligibility list, and the union's acceptance of that list, the Board's rejection of the challenge to her ballot was thus supported by substantial evidence.

■ *Paula Fleming, James McCrea, Andrew Netto and Carol Ormasen.* The Board's conclusions regarding the remaining four employees are not supported by substantial evidence under either of the relevant tests. First, we apply the "date certain" test. Kinney's personnel documents provide substantial evidence that they were hired on a temporary basis while work was being done on the IBM project, that they received no benefits, and that they were classified as temporary in Kinney's files. This is the only

evidence as to why they were hired, and it admits only one conclusion: Fleming, McCrea, Netto, and Ormasen were hired solely to make up for the inefficiencies caused by the IBM project. Thus, at the time of the election, their term of employment was certain to end when the IBM project was completed. This makes them temporary employees under the "date certain" test. *See S.R.D.C.*, 45 F.3d at 331 ("Under the ["date certain"] approach, an employee whose term of employment remains uncertain is eligible to vote."); *Caribbean Communications*, 309 NLRB at 712 (employee hired as a clerk "until the filing backlog was completed" ruled a temporary employee under "date certain" test); *Emco Steel*, 227 NLRB at 991 (employee was not a temporary employee because not hired "to perform a specific project or series of tasks").

Second, we apply the reasonable expectations test. Once again, there is no evidence that would support a reasonable expectation by the four employees that they were permanent employees. Of the four, only Fleming, Netto and Ormasen testified at the hearing before the ALJ. True, they testified that at no point *during their job interviews* were they specifically told that they were being hired solely in connection with the IBM project. But they never testified that they were actually given assurances of indefinite employment, as Wollman and Fairbanks did. And the fact that they did not learn of their temporary status during their job interviews says nothing about information they may have received later, about which they did not testify and apparently were never asked. There is simply no record evidence to support the affirmative conclusion that it would have been reasonable for these employees to think that they were permanent employees. In addition, there is some evidence that they should have known they had been hired only in connection with the IBM project. As Cognetti's October 25, 1991 speech demonstrates, the news had been disseminated at the warehouse that a group of employees had been hired to assist until the completion of the IBM project.

To summarize, substantial evidence under the "date certain" test supports the conclusion that the four employees were hired as temporary employees, and no evidence supports the opposite conclusion; there is no evidence under the "reasonable expectations" test to support the Board's conclusion that the four employees reasonably thought they were permanent, and there is some evidence to support a conclusion that they should have realized they were temporary. When we add to this analysis the exclusion of the challenged names from Kinney's eligibility list and the union's acceptance of that list, we conclude that these employees were temporary at the time of the November 1991 union election, and that their ballots should not have been counted.[9]

We therefore remand to the Board for purposes of determining the outcome of the election on the basis of the 34 uncontested ballots plus the ballots of employees Wollman and Fairbanks and George Erdman (the employee whose ballot was originally challenged by the union). If the Board can ascertain the outcome of the election on the basis that the ballots of Wollman, Fairbanks and Erdman are valid and that the ballots of Fleming, McCrea, Netto and Ormasen are invalid, we direct the Board to certify that result. If not, we direct the Board to order a new election.

### CONCLUSION

In sum, we decline to enforce either the Board's July 12, 1994 bargaining order based upon the unfair labor practices Kinney allegedly engaged in during the 1991 election or the Board's September 30, 1994 bargaining order based upon Kinney's refusal to recognize the legitimacy of the November 1991 election results. We remand to the Board for the purpose of determining the outcome of the election based upon the 34 uncontested ballots plus the ballots of employees Erdman, Wollman and Fairbanks. If the Board can ascertain the election outcome on the basis that the ballots of Wollman, Fairbanks and

---

9. The dissent takes us to task for improperly placing the burden of proof on the employees. Our focus, however, is not on whether an employer or a union should bear the burden of proving temporary status, but whether the Board's finding of temporary status is supported by substantial evidence. Here, there is simply insufficient evidence to support the Board's conclusion.

Erdman are valid and that the ballots of Fleming, McCrea, Netto and Ormasen are invalid, we direct the Board to certify that result. If not, we direct the Board to order a new election.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from so much of the majority's ruling as holds that there was not substantial evidence to support the Board's finding that four employees were not temporary employees. The majority reverses the Board's decision that Fleming, McCrea, Netto, and Ormasen were permanent employees whose ballots should therefore be counted because the majority finds that these four employees were temporary employees either because they had been hired only until a "date certain," Majority Opinion *ante* at 1424, 1425, or because they had no "reasonable expectations" of being other than temporary employees, *id.* at 1425, 1426. In my view there was substantial evidence to support the Board's rulings under both tests.

The majority, in support of its conclusion that the four employees in question were temporary under the "date certain" test, states that "Kinney's personnel documents provide substantial evidence that they were hired on a temporary basis while work was being done on the IBM project, that they received no benefits, and that they were classified as temporary in Kinney's files." Majority Opinion *ante* at 1425, 1426. The majority states that "their term of employment was certain to end when the IBM project was completed," *id.*, and that "substantial evidence under the 'date certain' test supports the conclusion that the four employees were hired as temporary employees, and no evidence supports the opposite conclusion," *id.* at 1425–1426. I have several difficulties with this ruling.

First, the fact that there may be substantial evidence to support one view does not mean that there is not substantial evidence to support the contrary view. "[E]ven as to matters not requiring expertise a court may [not] displace the [NLRB's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

Second, the company's personnel records on which the majority relies were viewed by the Board with skepticism: "The document ... was prepared and revised periodically on a word processor [and] does not have the traditional reliability of business records that are immutable in nature and integrated in a business system that makes alteration less convenient than a stroke of a pen or a punch at the keyboard." Opinion of the Administrative Law Judge dated June 18, 1993, as adopted by the Board ("Board Decision"), at 21 n. 97. The Board noted that the company's president Cognetti, though alert that changes in computer data could be made, had not been able to verify when the proffered record was made, or by whom, and could say only that it was in the computer a month *after* the election. *See id.* at 22 n. 98. We are not entitled to second-guess the Board's evaluation of the credibility of the evidence.

Third, there was substantial evidence to support the view that these four employees had not been hired to work only until a "date certain." None of the cases relied on by the majority found the "date certain" test met by hiring for a project whose completion target date was continually put off and, before the election in question, had disappeared from sight. Here, the IBM project had initially been scheduled for completion in September 1991, prior to the November election; that target was not met. Completion was rescheduled for January 1992, which also soon proved unrealistic, for "labor demands intensified in late October, with no apparent relief in sight." Board Decision at 21. The ALJ noted that even as of the date of the hearing before him, "I.B.M. still ha[d] not been able to complete the system," and that "*[t]he record does not reflect that a new target date had been set.*" *Id.* (emphasis added). The Board found that "[t]here is no doubt that [these four employees] were hired pursuant to increased labor demands that have continued to the instant hearing, and whose abate-

ment has not been defined with any precision." *Id.* at 20. The fact that before the election there was no foreseeable point at which the demand for the employees would abate, and the fact that no new target date was set, provide substantial evidence to support the Board's finding that these employees were not hired for a period that was to end on a "date certain."

In support of the conclusion that the four employees had no "reasonable expectations" of being other than temporary employees, the majority states that although these employees

> testified that at no point *during their job interviews* were they specifically told that they were being hired solely in connection with the IBM project[,] they never testified that they were actually given assurances of indefinite employment.... And the fact that they did not learn of their temporary status during their job interviews says nothing about information they may have received later....

Majority Opinion *ante* at 1425 (emphasis in original). The majority concludes that "[t]here is simply *no record evidence to support the affirmative conclusion* that it would have been reasonable for these employees to think that they were permanent employees." *Id.* (emphasis added). I have difficulties with the majority's factual and legal premises and its conclusion.

There was evidence that in some instances the Company did treat these four employees the same as permanent employees. For example, in addition to assigning them the same type of work and the same working hours as permanent employees, shortly prior to the election the employer invited the challenged employees to attend meetings of small groups of employees toward whom the company was directing its anti-union campaign. *See* Board Decision at 20 n. 90. As the Board noted, *see id.*, this would have indicated to the challenged employees, before the election, that the employer viewed them as eligible to vote and wanted their vote.

The majority states that these four employees "should have known that they had been hired only in connection with the IBM project" because Cognetti's October 25, 1991 speech indicated "that a group of employees

had been hired to assist until the completion of the IBM project." Majority Opinion *ante* at 1425. The Board found, however, and I know of no contrary evidence, that Cognetti's

> speech does not identify the individuals affected. Although one might infer that the reference is to some or all the six challenged voters, [Kinney] did not sponsor that document, more importantly, does not contend that this was the case. In this light, it would be hazardous to disenfranchise these employees on this basis.

Board Decision at 22 n. 101.

Most importantly, in ruling that the record was insufficient to support "the affirmative conclusion" that these four employees did not learn of their temporary status, the majority has in effect placed the burden of proof on the employees. In contrast, the principles framing the Board's decision of this issue were (a) that the temporary nature of employment is governed by mutual understanding rather than the employer's unilateral and uncommunicated intention, and (b) that the burden is on the employer to establish mutuality, at least by showing that it somehow communicated its intention to the employee. These principles are sound. It is a routine application of contract doctrine to refuse to allow an employer's uncommunicated conditions to control the terms of the employment contract. And traditionally, principles as to the allocation of burden of proof rest on goals and access, and a party with an affirmative goal and presumptive access to proof on a given issue has the burden of proof as to that issue. *See generally* 9 J. Wigmore, *Evidence* §§ 2485–2486 (Chadbourn rev. 1981). I would conclude that the Board's allocation of burden of proof was plainly permissible and hence is entitled to deference. *See generally NLRB v. Transportation Management Corp.*, 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983).

Within this legal framework, as to the four employees who testified that they were not told when hired that they were to be employed only temporarily, the Board found, *inter alia*, that they "worked regular hours, performing duties identical to those of other than temporary coworkers," Board Decision at 22; that Cognetti "never informed any of the six challenged voters that their employ-

ment would be for a fixed term," *id.;* that there was "no evidence that anyone from management did so," *id.;* that there was "no evidence that the [company's internal personnel] documents ... were ever shown to the employees in question," *id.;* that Fleming was told she was fired for having a poor attitude, apparently with no mention of her supposed temporary status, *id.* at 21 n. 94; that "[a]t no time, prior to the election, did the Employer ever see fit to inform the disputed employees that their employment was anything short of indefinite," *id.* at 22; and that the status of these employees "was never the subject of agreement or overt declaration," *id.* These findings are unimpeachable.

I am not prepared to say that the Board erred in placing on the employer the burden of proving that it communicated its intent to the employees, especially in light of the employees' testimony that they were not informed when hired that the company meant their employment to be temporary. And given that the employer had the burden of showing that it communicated its temporary-status intentions to the employees, I would conclude that the Board's decision is supported by substantial evidence.