INTER-NEIGHBORHOOD HOUSING CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 823, Docket 96–4106.

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1997.

Decided Aug. 19, 1997.

G. Peter Clark, New York City, (Clifton Budd & DeMaria, LLP, New York City), for Petitioner.

Corinna L. Metcalf, Supervisory Attorney, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Margery E. Lieber, Assistant General Counsel, Eric G. Moskowitz, Deputy Assistant General Counsel, National Labor Relations Board, Washington, DC, of counsel), for Respondent.

BEFORE: WALKER, PARKER and HEANEY *, Circuit Judges.

PARKER, Circuit Judge:

Appellant Inter–Neighborhood Housing Corporation ("INHOC") appeals from a final order issued by the National Labor Relations Board ("NLRB") on May 31, 1996, as corrected on June 13, 1996, reversing the Administrative Law Judge's ("ALJ's") grant of attorney's fees and other expenses to INHOC under the Equal Access to Justice Act, 5 U.S.C. § 504. The NLRB panel concluded that the NLRB General Counsel was substantially justified in issuing a complaint against INHOC for failure to execute a labor agreement because: (1) INHOC failed to provide affidavits in support of its position that no agreement had been reached; and (2) the case turned on credibility. Because the NLRB's decision is unsupported by substantial evidence, we reverse that decision and remand the case to the ALJ for a determination of the appropriate award of fees and other expenses.

## I. BACKGROUND

INHOC is a private, not-for-profit social service organization that provides community development programs for low-income families in the Bronx, New York. It manages residential apartment buildings, which it has rehabilitated under contracts with New York City and sold to low-income tenants as cooperatives.

### A. Bargaining

On December 13, 1991, Service Employees International Union Local 32E, AFL–CIO (the "Union"), was certified by the New York State Labor Board to represent three maintenance workers who were employed by INHOC at a building located at 785 East 181st Street in the Bronx. Bargaining between the Union and INHOC commenced on May 1, 1992, and additional bargaining sessions occurred on September 15, October 15, December 8 or 11, December 22, and February

---

* The Honorable Gerald W. Heaney, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

10, 1993. All meetings were held at the Union office, and the principal negotiators were Mario Rodriguez, the Union's vice-president, and Brian Clark, an attorney hired by INHOC to conduct bargaining on its behalf.

Both Rodriguez and Clark had limited authority to make a final decision with respect to a collective bargaining agreement. Clark was required to submit the proposed contract to INHOC's board of directors for approval. Similarly, Rodriguez had to obtain approval from the Union's president, Robert Chartier, for any language that deviated from the standard contract language contained in the Union's contracts with other employers.

At the May 1, 1992, meeting, the Union presented INHOC with its standard contract. Clark presented the Union with a counter-proposal by mail on May 12, 1992.

The parties met again on September 15, 1992. Representing the Union at this meeting were Rodriguez and the Union's attorney, Mr. Kern. Clark represented INHOC. The purpose of the meeting was to discuss INHOC's May 12 counter-proposal. The Union suggested modifications to the counter-proposal in at least eleven different areas. These suggestions were discussed further at the two following meetings, occurring on October 15 and 22.

The next meeting took place on December 8 or 11, 1992. At that meeting, the parties reached agreements on many of the outstanding issues. Rodriguez continued to insist, however, on the inclusion of at least three provisions that Clark continued to reject: (1) a "sale and transfer clause" (committing the employer to having any purchaser assume the labor agreement); (2) a "strike clause" (allowing for strikes upon non-payment of funds); and (3) a "prior better conditions clause" (requiring the employer to retain any past benefits exceeding the terms of the negotiated contract).

The parties met again on December 22, 1992. Clark and Rodriguez were present, as well as the Union's new attorney, Christopher Smith. The parties dispute how many issues remained open after this meeting. According to the Union, the only outstanding issues, again, were the sale and transfer clause, the strike clause, and the prior better conditions clause. The Union also claims that Clark agreed to draft a prior better conditions clause limited to one year. In contrast, INHOC contends that several additional issues remained open, including the precise language of a severance pay clause, whether employees could cash in sick and vacation days at the end of a year, and naming specific arbitrators for the arbitration clause. In addition, INHOC denies that Clark ever agreed to a prior better conditions clause that provided any benefits to workers not expressly set forth in the collective bargaining agreement.

Rodriguez and Clark had a phone conversation on December 28 or 29, 1992. The Union claims that during this conversation, Rodriguez informed Clark that Chartier, the Union president, had agreed to forego the sale and transfer clause and the strike clause. It also claims that Rodriguez continued to insist upon a prior better conditions clause going back at least one year. INHOC denies that Rodriguez provided Clark with this information, although Clark did believe that the parties were close to consummating an agreement and planned to send Rodriguez a proposed contract.

On December 29, 1992, Clark sent Rodriguez a proposed contract that included a severance pay clause, allowed employees to cash in unused sick and vacation time, and designated contract arbitrators. The contract did not contain: (1) a sale and transfer clause; (2) a strike clause; or (3) a prior better conditions clause. The Union claims that on December 29, after receipt of the draft contract, Rodriguez phoned Clark and protested that the contract did not contain a seniority clause or a prior better conditions clause. It also claims that Clark agreed to send a new draft that included these provisions.

While both parties agree that they had a phone conversation on January 28, 1993, the Union contends that at that time, Rodriguez was awaiting the new contract that Clark had promised on December 29, 1992, to send. In contrast, INHOC claims that Rodriguez listed a number of problems that he had with the newest draft contract, including the fact

that it did not contain a sale and transfer clause as well as various other clauses.

It is undisputed that on February 5, 1993, Clark faxed Rodriguez a letter "as the response of Inter–Neighborhood Housing to your collective bargaining proposals made last week over the telephone." This letter addressed proposals that Rodriguez allegedly made in eight different areas, and agreed with four of those proposals and rejected the others. Specifically, the letter rejected inclusion of a sale and transfer clause and contained nothing about the strike clause or prior better conditions clause. The letter ended with, "Kindly treat the above responses, along with other matters we have agreed to, as the employer's final offer."

A final meeting occurred on February 10, 1993. This meeting was attended by Rodriguez and Smith for the Union, and Clark and INHOC's executive director, Loraida Sepulveda, for INHOC. Again, the parties dispute the number of issues that remained open after this final meeting. Neither party sent the other a letter confirming what occurred at the meeting, nor did either party make any notes of the meeting. According to the Union, the parties agreed, among other things, to include a seniority clause and a modified prior better conditions clause. In contrast, INHOC contends that Clark continued to reject certain provisions that the Union requested, including a prior better conditions clause that provided benefits beyond those contained in the contract.

On March 5, 1993, the three maintenance employees wrote identical letters to Rodriguez requesting withdrawal of their membership in the Union.

On March 10, Clark sent Rodriguez a revised proposed contract and an accompanying letter. The proposed contract did not contain a transfer and sale clause or a strike clause, nor did it contain a prior better conditions clause limited to one year. Instead, the contract contained a prior better conditions clause that was limited to the benefits enjoyed by employees as of the date of the agreement.

The accompanying letter stated, in pertinent part:

> You informed me yesterday that the three maintenance employees had submitted to you a letter expressing their intent to withdraw from union membership.... Though INHOC is not averse to entering into a contract with Local 32E, we must stop bargaining at this point to take time to consider the legal implications of the employees' apparent withdrawal from Local 32E.

Rodriguez did not respond to Clark's March 10 letter.

By letter dated April 5, 1993, Clark terminated negotiations, and INHOC withdrew recognition from the Union.

## B. *The Charges and Investigation*

On April 7, 1993, the Union filed an unfair labor practice charge against INHOC with the NLRB's regional office. This charge alleged that since March 10, 1993, INHOC had refused to execute a contract agreed upon by the parties on December 23, 1992. The Union amended its charge on June 9 to include an allegation that INHOC threatened its employees with loss of paid holidays for continuing to support the Union.

The charges were investigated by an NLRB Regional Investigator. The Regional Investigator took two affidavits from Rodriguez: one on May 18, 1994, and a second on May 24, 1994. In his May 18 affidavit, Rodriguez stated that as of the December 22, 1992, meeting, there were three open issues: (1) the sale and transfer clause; (2) the strike clause; and (3) the prior better conditions clause. Rodriguez contended, however, that at the December 22 meeting, Clark agreed to the inclusion of a prior better conditions clause limited to one year. Rodriguez also stated that he phoned Clark the following day to tell him that Chartier had agreed to exclude the sale and transfer clause and the strike clause, and that Chartier had agreed to a prior better conditions clause limited to one year.

In his affidavit dated May 24, Rodriguez stated that he had a telephone conversation with Clark on January 28, 1993, where he asked why the revised contract had not yet been mailed to him. Clark allegedly said

that he was still having trouble drafting the prior better conditions clause.

Also in the May 18 affidavit, Rodriguez stated that at the parties' final meeting on February 10, 1992, Clark did not yet have a revised draft of the contract incorporating the matters discussed in the parties' December 23, 1992, phone call. According to Rodriguez, Clark again said that he still had to work on the language for the prior better conditions clause.

The Regional Investigator conducted an unsworn interview with Clark on July 19, 1993. Following this interview, INHOC sent the Regional Investigator a letter dated July 22, 1996, summarizing the interview and enclosing certain documentary evidence. This letter denied that the parties agreed to a contract in December or at any time thereafter. The letter stated that as far as INHOC was concerned, Clark sent the Union a contract proposal on December 29, 1992, and on January 28, 1993, Rodriguez raised a number of objections to this proposed contract during a telephone call with Clark. In support of these contentions, INHOC enclosed a copy of the December 29 proposed contract; a copy of Clark's handwritten notes allegedly taken contemporaneously with the January 28 telephone conversation; and the letter faxed by Clark to Rodriguez dated February 5, 1993, wherein he allegedly responded to the demands made by Rodriguez in their January 28, 1993, conversation.

INHOC's July 22 letter to the Regional Investigator also stated that Clark had never at any time agreed to a prior better conditions clause limited to one year. Rather, it was INHOC's position that Clark told Rodriguez and Smith that he would attempt to draft language consistent with his position that no benefits would be offered that were not set forth in the collective bargaining agreement. In addition, INHOC denied ever learning from Rodriguez that the Union had agreed to forego the sale and transfer and strike clauses.

After receiving INHOC's letter, the NLRB Regional Investigator interviewed Smith on August 2, 1993. Smith only recollected being present at the December 22, 1992, meeting, although Clark and Rodriguez both stated

that he was also present at the February 10, 1993, meeting. Smith took notes of the December 22 meeting. According to those notes, no decisions were reached regarding: (1) whether an employee terminated for cause would receive vacation pay; (2) the inclusion of a seniority clause and prior better working conditions clause; (3) the inclusion of a strike clause; (4) the inclusion of a sale and transfer clause; and (5) the inclusion of a staff reduction clause.

## C. *The Complaint and ALJ Decision*

Pursuant to the foregoing investigation, the NLRB General Counsel issued a complaint on August 30, 1993, which alleged: (1) that since February 10, 1993, INHOC had refused to proffer or execute a collective bargaining agreement that it had reached with the Union; (2) alternatively, since February 10, 1993, Clark had failed to submit an agreement made between Clark and the Union to INHOC's board of directors; and (3) that since March 19, 1993, INHOC had improperly withdrawn recognition of the Union. The NLRB complaint differed from the Union's original charge in that the complaint alleged that a contract was formed on February 10, 1993, while the charge claimed a contract existed as of December 23, 1992.

The case was tried before an ALJ in February 1993. The ALJ concluded that no agreement had been reached by February 10; therefore, INHOC did not act improperly by failing to execute the contract or submit it to the board of directors for ratification. In addition, the ALJ concluded that the Union's majority status was effectively rebutted on March 5, 1993, when the three employees sent letters to the Union indicating their desire to withdraw. According to the ALJ, this justified INHOC's refusal to continue negotiations with the Union. Accordingly, the ALJ dismissed the complaint.

Neither party filed exceptions to the ALJ's decision.

## D. *INHOC's EAJA Application*

On December 7, 1994, INHOC filed an Application for Award of Fees and Other Expenses pursuant to the Equal Access to

Justice Act ("EAJA"), 5 U.S.C. § 504(a), and section 102.143 of the NLRB's Rules and Regulations. In a separate petition, INHOC asked the NLRB to increase the maximum rate for attorney's fees from $75 per hour to $150 per hour. The NLRB transferred the EAJA application to the ALJ for adjudication.

The EAJA provides, in pertinent part:

An agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was *substantially justified* or that special circumstances make an award unjust.

5 U.S.C. § 504(a)(1) (emphasis added). In *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), the Supreme Court defined "substantially justified" as follows:

We are of the view, therefore, that as between the two commonly used connotations of the word "substantially," the one most naturally conveyed by the phrase before us here is not "justified to a high degree," but rather "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person.

487 U.S. at 565, 108 S.Ct. at 2549.

The ALJ determined that the NLRB General Counsel was not substantially justified in issuing the complaint against INHOC. The ALJ concluded that the General Counsel had sufficient documentary evidence to demonstrate not only that the Union's charges were unsupported, but that Rodriguez (the Union's sole supportive witness) was not sufficiently reliable to justify proceeding.

Specifically, the ALJ reasoned that because Rodriguez initially claimed that the parties reached an agreement on December 23, 1992, and the Regional Investigator determined that no contract was formed until February 10, 1992, this proved that Rodriguez's testimony was not reliable. Further, the ALJ noted that the Regional Investigator never interviewed the Union president, Char-

tier, to determine whether Chartier actually did agree to forego the sale and transfer clause and the strike clause, as Rodriguez maintained occurred. Moreover, the ALJ noted that when the General Counsel decided to issue a complaint on the grounds that an agreement had been reached on February 10, 1993, rather than on December 23, 1992, the General Counsel never approached IN-HOC with this theory. Thus, INHOC was deprived of the opportunity to rebut this amended charge. Finally, the ALJ rejected the General Counsel's argument that because there was a credibility issue at the time the complaint was issued, it was proper to issue a complaint so that the credibility issue could be adjudicated by an ALJ. The ALJ referred to section 10600 of the NLRB's Casehandling Manual, which places the burden of resolving credibility issues on the NLRB Regional Investigator, except when the Regional Investigator is unable to resolve the conflict and "resolution of conflict *means the difference between dismissal and issuance of the complaint.*"

Both parties filed exceptions to the ALJ's decision, and the NLRB designated a three-member panel to hear the appeal. Reversing the ALJ's decision, the panel determined that the General Counsel was substantially justified in issuing the complaint because: (1) INHOC had provided documentary evidence supporting its position that no agreement had been reached, but no affidavits; and (2) at the trial of the underlying complaint before the ALJ, the case turned on credibility.

## II. DISCUSSION

### A. *Standard of Review*

■ We must affirm the NLRB's decision that the General Counsel was substantially justified in issuing a complaint unless that decision is unsupported by substantial evidence. *See* 5 U.S.C. § 504(c)(2); *Kinney Drugs, Inc. v. NLRB,* 74 F.3d 1419, 1427 (2d Cir.1996).

### B. *Analysis*

#### 1. *Effect of Unsworn Testimony*

■ The NLRB panel concluded "that based on the investigatory evidence, includ-

ing the fact that [INHOC] provided letters but not sworn testimony, and the judge's finding in the unfair labor practice proceeding that the case turned on credibility, issuance of the complaint was substantially justified within the meaning of *Pierce v. Underwood.*"

■ We disagree with the NLRB that the unsworn nature of Clark's testimony should serve as grounds for reversing the ALJ's award of fees and expenses. On the contrary, the NLRB's own Casehandling Manual states, "[n]or does an unwillingness to sign or to swear to the truth of a statement have significance except when related to the reasons for the refusal."[1] Moreover, giving false statements to the government is a felony, *see* 18 U.S.C. § 1001, as well as an act for which an attorney, such as Clark, may be disciplined. *See, e.g.,* Code of Professional Responsibility DR 7–102, N.Y. Judiciary Law App. at 550 (McKinney 1996) ("In the representation of a client, a lawyer shall not: . . . . Knowingly make a false statement of law or fact."). The Regional Investigator had no basis to assume that Clark's statements were less reliable than Rodriguez's sworn statements solely because Clark's statements were unsworn.[2]

In fact, Clark's statements were corroborated by other evidence. Clark gave the Regional Investigator several documents prepared prior to the investigation that supported his oral and written statements that no agreement had been reached. In addition, Smith, the Union's attorney, gave a sworn affidavit based upon his notes from the December 22, 1992, bargaining session. The statements contained in that affidavit confirm Clark's testimony that the parties left the December 22 meeting without having reached agreements on several outstanding

issues and seriously undercut Rodriguez's sworn statement that agreement had been reached on a prior better conditions clause.

The NLRB points to nothing that renders Clark's testimony suspect. Thus, to the extent that the NLRB relied upon the unsworn nature of Clark's statements to justify the General Counsel's issuance of the complaint, that decision is unsupported by substantial evidence. *See Pierce v. Underwood,* 487 U.S. at 565, 108 S.Ct. at 2549.

### 2. *Resolving Credibility Issues*

■ While INHOC's liability under the NLRA ultimately may have turned on credibility, as many cases do, this fact alone cannot justify the issuance of the complaint. Rather, where, as here, there is evidence that raises a fundamental question as to the viability of the allegations in a charge, the NLRB has the responsibility to conduct a reasonable investigation to resolve any credibility issues before bringing a complaint. *See Hess Mechanical Corp. v. NLRB,* 112 F.3d 146, 150 (4th Cir.1997).

According to section 10060 of the NLRB's own Casehandling Manual, the burden of resolving credibility issues is on the NLRB Regional Investigator, except when that Regional Investigator is unable to resolve the conflict, and "resolution of the conflict *means the difference between dismissal and issuance of the complaint.*" The Casehandling Manual provides specific instruction to investigators on how to resolve factual conflicts:

> Where a witness has been contradicted on a relevant fact since he/she last gave testimony, he/she should be reinterviewed. And, to the extent further reinterviews of witnesses will help resolve the issues, they should be undertaken.

*Transfer Co.,* however, the EAJA applicant refused to allow the NLRB investigator to interview and take affidavits from anyone in management and instead offered self-serving letters denying the allegations contained in the charges against it. In the instant case, the Regional Investigator conducted an extensive interview with Clark. The substance of this interview was memorialized in a letter to the Regional Investigator.

---

1. While we note that the NLRB's Casehandling Manual "is not a rule or regulation" binding on the General Counsel or the NLRB, *see NLRB v. Birdsall Constr. Co.,* 487 F.2d 288, 291–92 (5th Cir.1973), it nevertheless provides guidance in assessing the reasonableness of the General Counsel's conduct.

2. The NLRB cites *C.I. Whitten Transfer Co.,* 312 NLRB 28, 29 (1993) to support the proposition that unsworn testimony should be afforded less weight than sworn testimony. In *C.I. Whitten*

Finally, in situations where factual issues are close, it may be appropriate to have a reinterview conducted by a second Board agent (typically, an attorney assigned to the case).

Thus, pursuant to the NLRB's own policies, if it appears at the outset that a case involves credibility issues, the Regional Investigator should attempt to resolve those issues prior to recommending filing a complaint.

Despite the NLRB's specific instructions on how to resolve credibility issues, the Regional Investigator never attempted to resolve the conflict between Clark's and Rodriguez's version of events. Even after he received Clark's written statements and documentary evidence, the Regional Investigator failed to reinterview Rodriguez. Instead, the Regional Investigator chose to interview Smith, the Union's attorney, who corroborated Clark's account of the December 22, 1992, meeting, rather than Rodriguez's account. Despite this further contradiction of Rodriguez's version of events, the investigator still did not reinterview Rodriguez, nor did the investigator attempt to corroborate Rodriguez's testimony by interviewing Chartier, the Union president. This decision was unreasonable in light of the fact that Rodriguez's sworn statements were entirely uncorroborated. *See Hess Mechanical Corp.*, 112 F.3d at 150; *cf. Charter Mgt., Inc. v. NLRB*, 768 F.2d 1299, 1302–03 (11th Cir.1985) (concluding that General Counsel's decision to credit employees' statements that ultimately were discredited at trial was substantially justified in light of other evidence supporting those witnesses' statements).

Moreover, sometime during the course of the investigation, the Regional Investigator decided that a contract was not formed on December 23, 1992, as initially charged, but that one was formed on February 10, 1993. The Regional Investigator never informed INHOC about this amended allegation, however, thus depriving INHOC of the opportunity to rebut this new charge. Had INHOC been aware of the change, it could have produced Sepulveda, INHOC's executive director, as a witness. Sepulveda was present at the February 10 meeting when the contract was allegedly made, and could have testified, as she did at trial, that no agreements were reached at that meeting.

In light of the evidence contradicting Rodriguez's sworn statements, the General Counsel was not justified in filing the complaint before any attempt was made to resolve the factual conflicts. Rodriguez's testimony was the only testimony supporting the Union's position. In refusing to investigate further, the Regional Investigator must have concluded that Clark was lying, falsifying documents, and acting against INHOC's stated interests. The record contains no basis for such conclusions. *See Pierce*, 487 U.S. at 565, 108 S.Ct. at 2550 (defining "substantial justification" as under the EAJA as "having a reasonable basis in both law and fact").

■ The inadequacy of the investigation is especially glaring in light of the fact that not even the NLRB credited Rodriguez's testimony that a contract was formed on December 23, 1992, finding instead that one was formed on February 10, 1993. It is inexcusable for the NLRB to change tack mid-course in its investigation and to pursue a theory that the Union does not press, without giving the employer the opportunity to respond. The NLRB's argument that the case turned on credibility therefore "misses the mark." *Hess Mechanical Corp.*, 112 F.3d at 150. As the Fourth Circuit held in a similar case, "The EAJA does not tell an agency how to handle a case, but the General Counsel cannot decline to conduct further inquiry and then plead his own failure to investigate as reason to conclude that his position was substantially justified." *Id.*

Accordingly, to the extent that the NLRB relied upon the fact that the case turned on credibility to reverse the ALJ, that decision is unsupported by substantial evidence.

■ In conclusion, we find that there was not substantial evidence in the record to support the Board's determination that the General Counsel was substantially justified in filing a complaint against INHOC. "Given the deference due the Board and the significance of its statutory mission, we do not casually intervene in a collateral dispute over fees and costs." *Hess Mechanical Corp.*, 112

F.3d at 150. In this case, however, the General Counsel brought an action against IN-HOC on the basis of Rodriguez's testimony, which could not reasonably have been credited in light of other evidence gathered during the course of the investigation.

## III. CONCLUSION

The NLRB's conclusion that the General Counsel was substantially justified in issuing the complaint is unsupported by substantial evidence. Accordingly, the NLRB's decision is reversed and the case remanded for a determination of the appropriate award of fees and other expenses.